579 F.2d 449
 78-2 USTC P 9557
 Harry V. JUMP, Superintendent of Insurance, State of Ohio,
Conservator of Manchester Insurance and Indemnity
Corporation, Appellant,
v.
MANCHESTER LIFE & CASUALTY MANAGEMENT CORP., Ralph B.
Hutchings, Samuel J. Goldenhersh, James B.
Hutchings, Robert R. Hutchings and Carl
Miller, Appellees.
 No. 77-1825.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 17, 1978.
Decided June 21, 1978.
Rehearing and Rehearing En Banc Denied July 17, 1978.
 
 William G. Ohlhausen of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for appellant; Richard A. Ahrens, St. Louis, Mo., on the brief.
 Gerald A. Rimmel of Susman, Schermer, Willer & Rimmel, St. Louis, Mo., for appellees; Barry S. Schermer, St. Louis, Mo., on the brief.
 Richard D. Shewmaker of Thompson, Walther, Shewmaker & Gaebe, St. Louis, Mo., filed brief for amicus curiae Pioneer Bank & Trust Co.
 Before LAY and ROSS, Circuit Judges, and HANSON,* Senior District Judge.
 HANSON, Senior District Judge.
 The appeal in this diversity action presents a single, discrete issue for our review: whether an insolvent subsidiary of an affiliated corporate group is entitled to share in a group consolidated federal income tax refund generated largely by the subsidiary's losses, in an amount larger than the subsidiary's own income tax payments. The district court,[1] in ruling on cross motions for summary judgment, permitted the subsidiary to recover a portion of the refund up to the amount of its tax payments for the years in question, but would not allow it to claim any additional portion of the refund of tax dollars paid by other members of the affiliated group. Jump v. Manchester Life & Casualty Management Corp., 438 F.Supp. 185, 188-190 (E.D.Mo.1977). Appellant Jump, Superintendent of Insurance for the State of Ohio (the Superintendent) and conservator and liquidator of the insolvent subsidiary appeals insofar as the district court's judgment denied allocation to the subsidiary of the entire refund. We affirm.I.
 Manchester Life and Casualty Management Corporation (Management Corporation), a Missouri corporation, owns substantially all of the stock of Manchester Insurance and Indemnity Company (MI&I) and Manchester Premium Budget Corporation (Premium). MI&I, in turn, owns approximately 85% Of the Pioneer Bank and Trust Company (Pioneer). The five individual defendant-appellees are or were directors of both Management Corporation and MI&I.
 The pertinent facts are simple and uncontested.[2] Management Corporation is the parent for an affiliated corporate group consisting of Management Corporation, MI&I, Pioneer and Premium. On behalf of the group, and as permitted by 26 U.S.C. §§ 1501, 1504, Management Corporation filed consolidated federal income tax returns for 1970, 1971, 1972, 1973, and 1974. Each subsidiary would calculate its separate federal income tax liability and pay that amount to Management Corporation. During the years 1970, 1971, and 1972, MI&I paid Management Corporation a total of $733,505.00 as its contribution to the consolidated tax liability of the group for those years. In 1973 and 1974 MI&I suffered substantial losses and made no payments.
 The 1973 calendar year was a net operating loss year for the entire affiliated group, including MI&I. Consequently, in the return for calendar year 1973, Management Corporation claimed a refund which included a net operating loss carryback for taxes paid in 1970, 1971, and 1972. See 26 U.S.C. § 172(b). In early 1974, the Internal Revenue Service (IRS) refunded $703,255.00 to Management Corporation as agent for the group, and Management Corporation in turn paid this amount over to MI&I. As a result of this refund, MI&I recovered all but $30,250.00 of the total it had paid for income taxes in 1970, 1971, and 1972.
 The 1974 calendar year was apparently again a dismal one for MI&I. It suffered a net operating loss in excess of three million dollars and, as a direct result, the affiliated group sustained a net loss in similar amount. Because of its consolidated filing status, the affiliated group was again in a position to take advantage of MI&I's disproportionate losses to gain additional refunds of taxes paid in calendar years 1971 and 1972 by virtue of net operating loss carryback. Accordingly, on March 15, 1975, Management Corporation filed an application with the IRS for a tax refund. On May 8, 1975, Management Corporation received two checks from IRS: one check for $692,983.17 representing a refund for the calendar year 1972, and another check for $118,467.19 representing a refund for calendar year 1971, for a total refund in 1971 and 1972 tax dollars of $811,450.36 including interest. This second refund is the focus of the present dispute.
 On September 23, 1975, the Court of Common Pleas of Franklin County, Ohio, with the consent of MI&I's Board of Directors, appointed appellant Superintendent as conservator of MI&I. On the Superintendent's motion, the same court subsequently adjudicated MI&I insolvent and ordered its liquidation on February 13, 1976.
 On June 16, 1976, the Superintendent filed his complaint in the present action. The complaint, as amended, was in three counts. In Count I the Superintendent alleged that the Management Company, by not paying the $811,450.36 refund to MI&I, had converted MI&I's property in that amount. Count II was directed against the individual appellee directors and asserted a breach of fiduciary duties. Count III alleged that $943,167.36 was recorded as an account due MI&I for income tax refunds on Management Corporation's books. The Superintendent moved for summary judgment on Counts I and III. Management Corporation and the directors moved for summary judgment on Counts I, II, and III. The district court partially granted the Superintendent's motion on Count I and entered judgment for $30,250.00, a figure which represents the balance between MI&I's previously received refund of $703,255.00 for years 1970, 1971, and 1972 and the total sum of $733,505.00 MI&I paid to Management Corporation for income taxes in those years. However, on Counts II and III, the district court granted summary judgment for Management Corporation and the directors. As we understand the Superintendent's brief and argument before us, Counts II and III have been abandoned as independent claims, and the only question presented to us for resolution is whether the district court erred in ruling that Management Corporation did not convert MI&I's property by retaining most of the second carryback refund for 1971 and 1972.[3] Management Corporation, for its part, does not appeal from the judgment against it for $30,250.00.
 II.
 Preliminarily, we note that what entity is entitled to ultimately receive the benefit of a consolidated tax refund is a matter which is not addressed in the Internal Revenue Code. See In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262, 265 (9th Cir.), Cert. denied sub nom. Western Dealer Management, Inc. v. England, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); M&M Transportation Co. v. U. S. Industries, Inc., 416 F.Supp. 865, 869 (S.D.N.Y.1976). Though IRS regulations provide that the parent corporation is the agent for each subsidiary in the affiliated group, Treas.Reg. § 1.502-77, this agency relationship is for the convenience and protection of IRS only and does not extend further. In the absence of controlling federal law, state law governs the rights and responsibilities as between a parent corporation and its subsidiaries.
 Contrary to the Superintendent, we believe that Missouri law, not Ohio law, controls here. The trial court sitting in Missouri was required to apply the choice of law rules of Missouri. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort actions the Missouri courts have adopted the "most significant relationship" test found in Restatement (Second) of Conflicts of Laws § 145 (1971). See Byrn v. American Universal Insurance Co., 548 S.W.2d 186, 188-89 (Mo.Ct.App.1977). The application of that test here compels the conclusion that Missouri law applies. Management Corporation is incorporated in Missouri and headquartered there. The tax refund money was paid to Management Corporation in Missouri and was deposited in an account at the Pioneer Bank and Trust Company, a Missouri bank. Finally, MI&I's principal place of business was also in Missouri, with the result that this case involves primarily an adjudication of rights and responsibilities between two Missouri corporations. By contrast, the only connection Ohio has with the litigation is the fact that MI&I was incorporated there and, consequently, was subjected to the supervision of the appellant Superintendent.[4]
 In the end, however, the question of which state's substantive law applies is largely problematical, for the Superintendent's position is fundamentally flawed in its basic premise.
 The Superintendent's theory is that Management Corporation engaged in self-dealing with its subsidiary MI&I in breach of the fiduciary duty owed by a parent corporation to its subsidiary by converting a valuable asset of the subsidiary to its own use without compensation. The linchpin of this argument is the premise that MI&I's 1974 net operating loss generated a valuable asset because of its income tax consequences, the asset being the right to use the loss. In view of the fact that MI&I has, by voluntary payment and operation of the district court's judgment, received a refund of all the income tax dollars it paid to Management Corporation during the relevant tax years, Cf. In re Bob Richards, supra at 265, MI&I's right to use its 1974 net operating loss as an offset might be viewed as an asset of MI&I from only two possible perspectives. First, the use of the loss might have inherent value to MI&I to the extent it could be carried over to offset tax liability in future profit-making years. Second, to the extent MI&I could bargain with the other members of the affiliated group for the use of its loss to the advantage of the group, the benefit of such a bargain could potentially be viewed as an asset of MI&I. Whatever may be the merit in viewing an operating loss as an asset in other contexts, in the narrow circumstances of this case, we are unable to consider the right to use MI&I's net operating loss as an asset of MI&I from either perspective. The Superintendent's argument thus falls with the rejected premise.
 The Superintendent asserts that the right to use MI&I's net operating loss has inherent value to MI&I because it might have been carried forward to offset MI& I's subsequent income. Instead, it was carried back to achieve a tax benefit for the affiliated group, a benefit in which MI&I did not share beyond the amount of tax dollars MI&I had previously paid to Management Corporation. The right to use the net operating loss as an offset could be considered an asset for carryover purposes only if MI&I was a going concern, likely to have taxable income in 1975 and subsequent years against which to offset the loss. See 26 U.S.C. § 63(a). However, MI&I was far from being a going concern at the end of 1975. In fact, it operated under the control of a conservator appointed September 23, 1975, and was subsequently adjudged insolvent and ordered liquidated by the Franklin County, Ohio Court of Common Pleas on February 13, 1976 four months before the Superintendent filed his complaint in this action. We conclude, therefore, that the right to use its net operating loss to gain carryover tax advantage was not an asset of MI&I because its value was conditioned on the existence of future income potential of MI&I.
 If MI&I's net operating loss was of no value with respect to its own tax situation, the use of the loss was not without value to the other members of the affiliated corporate group for they realized a substantial tax savings as a result of MI&I's net operating loss. The Superintendent appears to argue by implication that MI&I could have bargained for the use of its net operating loss with other members of the affiliated group to whom the loss was valuable. In that event, the benefit of such a bargain to MI&I, rather than MI&I's own tax use of the loss, becomes the asset entitling it to compensation. As Justice Jackson once put it in a similar context:
 
 
 1
 Each corporation then had a bargaining position. The stakes were high. Neither could win them alone, although each had an indispensable something that the other was without. It was as if a treasure (the tax savings) . . . were offered by the Government to whoever might have two keys that would unlock it. Each of these parties had but one key, and how can it be said that the holder of the other key had nothing worth bargaining for?
 
 
 2
 Western Pacific Railroad Corp. v. Western Pacific Railroad Co., 345 U.S. 247, 277, 73 S.Ct. 656, 671, 97 L.Ed. 986 (1953) (Jackson, J., dissenting). An initial problem with the application of this perspective here is that MI&I was not in a real position to bargain for its cooperation in the 1974 consolidated return. Having consented to the filing of a consolidated return in previous years, MI&I was not at liberty to simply withdraw from the affiliated group in 1974.[5] Pertinent IRS regulations provide that a group which files a consolidated return in the immediately preceding taxable year must do so for the following year unless, upon application of the common parent and "for good cause shown," the Commissioner permits the filing of separate returns. Treas.Reg. §§ 1.502-75(a), (c)(1)(i). See Orgill Brothers v. United States, 508 F.2d 1219, 1220-21 & n.1 (6th Cir. 1975); 8A J. Mertens, The Law of Federal Income Taxation § 46.21, at 56 (1971). MI&I's prior course of conduct with respect to its income tax returns therefore rendered its bargaining position in 1974 highly conjectural for withdrawal of its cooperation was conditioned on IRS assent. In any event, we are unable to hold that Management Corporation had any fiduciary duty to compensate MI&I for its continuing cooperation in the filing of consolidated returns. This mutually agreed upon method of filing returns had been employed by the affiliated corporations over a number of years at no disadvantage to MI&I and with the obvious understanding that the practice would continue. Moreover, as previously shown, MI&I's net operating losses were of little independent value to MI&I in terms of tax consequences.
 
 
 3
 Because we conclude that MI&I's net operating loss did not generate an asset either in terms of MI&I's right to use said loss to offset future income of MI& I, or in terms of the benefit of any bargain MI&I might have struck for the use of its loss by other members of the affiliated group, we hold that Management Corporation could not have converted MI&I's property in violation of any fiduciary duty owed by a parent to its subsidiary under Missouri law. Nor do we see any other reason under Missouri law, absent an express agreement, to divert a refund of tax dollars paid by other members of the affiliated group to reward MI&I for the fortuitous effect its losses, in combination with the earnings of other group members, had on the consolidated tax liability of the group. See Western Pacific Railroad Corp. v. Western Pacific Railroad Co., 197 F.2d 994, 1003-04 (9th Cir. 1951), Vac. other grounds, 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953), Prior opinion aff'd, 206 F.2d 495 (9th Cir.), Cert. denied, 346 U.S. 910, 74 S.Ct. 242, 98 L.Ed. 407 (1954).
 
 
 4
 However, we stress that our holding is a limited one. Management Corporation has not appealed from the judgment against it for the balance of the amount paid to it for taxes by MI&I in 1970, 1971, and 1972. Thus we have no occasion to deal with the question of whether and under what circumstances a subsidiary is entitled to its pro rata portion of a consolidated refund paid to the parent. Cf. In re Bob Richards, supra at 265. By the same token, our conclusion that the tax use of MI&I's net operating loss is not an asset of MI& I is necessarily controlled by the facts of MI&I's moribund financial condition and history of participation in the filing of consolidated returns. We conclude only that on these facts the Superintendent, as conservator of MI&I, is not entitled to share in the consolidated refund in an amount greater than the amount paid by MI&I for its tax liability.
 
 
 5
 Affirmed.
 
 
 
 *
 The Honorable William C. Hanson, Senior District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri
 
 
 [2]
 Because there was no genuine issue of material fact, it was appropriate for the district court to dispose of the cause of action on the motions for summary judgment. Rule 56(c), Fed.R.Civ.P. We note that no party argues that summary judgment treatment was inappropriate
 
 
 [3]
 Management Corporation argues that it, in fact, paid the $811,450.36 refund in question to MI&I in 1975 by diverting the refund to help make an accelerated payment of "agents' balances" on premiums Management Corporation collected for MI&I on the latter's insurance policies. The accelerated payments were made at the request of MI&I's conservator. To say, as Management Corporation appears to, that payment of a pre-existing obligation out of the disputed refund money somehow discharged any independent duty to pay over the refund, is clearly totally without merit and we give the argument no attention
 
 
 [4]
 The Superintendent's Ohio citizenship renders the exercise of diversity jurisdiction proper under 28 U.S.C. § 1332. See, e. g., Nunn v. Feltinton, 294 F.2d 450, 453-55 (5th Cir. 1961), Cert. denied, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962); 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3606, at 634-35 (1975)
 
 
 [5]
 No claim is made that MI&I's original consent to the filing of consolidated returns is tainted with self-dealing on the part of Management Corporation, nor does there appear to be any evidence that the initial decision to file consolidated returns was other than open and fair. See Bayless Building Materials Co. v. Peerless Land Co., 509 S.W.2d 206, 213-14 (Mo.Ct.App.1974)