**In re REVCO D.S., INC., et al., Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**REVCO D.S., INC., and General Computer Corporation, Defendants.**

**Bankruptcy Nos. 588–1308 to 588–1321, 588–1305, 588–1761 to 588–1812 and 588–1820.**

United States Bankruptcy Court, N.D. Ohio.

Jan. 31, 1990.

John Silas Hopkins, III and Donald A. Wochna, Baker & Hostetler, Cleveland, Ohio, for debtors.

Stuart E. Hertzberg, Pepper, Hamilton & Scheetz, Detroit, Mich., for unsecured trade creditors' committee.

Conrad Morgenstern, Cleveland, Ohio, U.S. trustee.

Brad Eric Scheler, Fried, Frank, Harris, Shriver & Jacobson, New York City, for unsecured noteholders' committee.

Robert J. White, O'Melveny & Myers, Los Angeles, Cal., for unofficial committee of secured bank lenders.

Richard Lieb and William J. Rochelle, Kronish, Lieb, Weiner & Hellman, New York City, for unofficial preferred equity committee.

Frederick M. Luper, Luper, Wolinetz, Sheriff & Niedenthal, Columbus, Ohio, for Odd Lot Trading, Inc. Creditors Committee.

Alan R. Lepene, Michael A. Ellis, and Daniel N. Steiger, Thompson, Hine and Flory, Cleveland, Ohio, for Gen. Computer Corp.

Iden Grant Martyn, Asst. U.S. Atty., Cleveland, Ohio.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CROSS-CLAIMS

HAROLD F. WHITE, Bankruptcy Judge.

The trial of the above captioned adversary proceeding was held before this Court on June 27, 28 and 30, 1989. John Silas Hopkins, III and Donald A. Wochna appeared for Revco D.S., Inc. ("Revco") and Alan R. Lepene, Michael A. Ellis and Charles E. Hallberg appeared for General Computer Corporation ("GCC"). Testimony and evidence were presented to the Court and at the request of the Court the parties submitted proposed findings of fact and conclusions of law. The parties also filed pretrial briefs. Based upon a review of the pleadings submitted, and the evidence presented at the trial this Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and General Order of Reference 84 of the Northern District of Ohio. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a).

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3. On July 26 and 28, and October 4 and 5, 1988 Revco and substantially all of its operating subsidiaries, filed separate chap-

ter 11 petitions pursuant to Section 301 of the Bankruptcy Code. Revco thereupon continued in the management and operation of its businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 1107, 1108. No trustee or examiner has been appointed in these cases.

4. Revco is engaged in the operation of approximately 1,900 retail drug stores throughout the United States.

5. On April 17, 1989 the United States of America ("USA") commenced this adversary proceeding by filing a Complaint interpleading Revco and GCC. (Docket No. 1) The USA delivered to the Court a tax refund check for $403,234.00 made payable to Revco. The check for $403,234.00 is a tentative refund (the "Refund") representing the application of GCC's 1988 net operating loss ("NOL") to Revco's consolidated tax return for fiscal year 1986 (the "Revco Consolidated Return"). [Complaint paras. 7, 8, 12, (Docket No. 1), Revco Ex. 1] In the Complaint the USA explained that both Revco and GCC have made a claim to the Refund and the USA was uncertain as to which claimant the Refund should be remitted. [Complaint, paras. 9–10, (Docket No. 1)] The Refund has been deposited into a special bank account pending the outcome of this adversary proceeding. By Order of this Court, the USA was discharged from any further liabilities as to the interpleaded Refund. (Docket Nos. 7 and 39)

6. Pursuant to a Pre-trial Order (Docket No. 12) GCC and Revco filed cross-claims setting forth their claims to the Refund.

7. GCC asserts that it is entitled to the Refund and to have the Refund endorsed over to it, because the Refund resulted directly from the carry back of a GCC loss against income solely attributable to GCC. [GCC Cross–Claim, para. 19, (Docket No. 14)] Revco asserts that it is entitled to the Refund because Revco paid the consolidated group's tax liability (for fiscal year 1986 when GCC was a member of the group) and GCC never reimbursed Revco for its share of the taxes paid. [Revco Answer and Cross–Claim, para. 11, (Docket No. 15)]

8. On May 25, 1989, the Court set this adversary proceeding for expedited discovery and an early trial. (Docket No. 12) Trial commenced on June 27, 1989, and continued on June 28 and 30. GCC called as witnesses Anthony Tricarichi, Jr. and Alexander Hamm, partners of Peat Marwick Main & Co.; Stephen Gruber, a Revco vice-president of the Revco tax department; Robert Carroll Hudson, former chief financial officer of Revco; and Richard R. Pilarczyk, president of GCC. Revco called no witnesses.

9. Prior to March 4, 1986 GCC was a wholly owned subsidiary of Revco. (Tr. pp. 41–42, 55–56)

10. While it was a wholly owned subsidiary of Revco, GCC was a member of the Revco consolidated group (the "Consolidated Group") for federal income tax purposes. (Revco Ex. 2)

11. In the latter half of 1985 Revco decided to sell its majority interest in GCC to the public through an initial public offering of GCC stock (the "IPO"). (GCC Ex. 9; Tr. pp. 41, 389–390)

12. Neither in contemplation of the IPO nor at any other time was there an agreement, written or oral, express or implied, between GCC and Revco pertaining to the disposition of any tax refund resulting from losses GCC might suffer in the years following the IPO. (Tr. pp. 388–391)

13. At the trial Revco waived the issue that an implied agreement existed between the parties that any tax refunds would belong to the parent corporation. (Tr. pp. 24–25)

14. The IPO was underwritten by McDonald & Company Securities, Inc. (the "Underwriters") and became effective on March 4, 1986. (GCC Ex. 1; Tr. p. 42)

15. Prior to March 4, 1986 an intercompany account (the "Intercompany Account") existed between GCC and Revco which recorded all transactions between the two companies. Not all transactions involved an exchange of cash. (Tr. pp. 42–43)

16. The Intercompany Account showed a liability owing from GCC to Revco as of November 30, 1985 of $3,174,081. (GCC Ex. 2; Tr. p. 55)

17. The amount GCC owed Revco on the Intercompany Account included, among other items, liabilities for advances from Revco, declared dividends in amounts equal to GCC's gross profits on all of its sales to Revco and Revco subsidiaries (the "Intercompany Profit"), interest charges, income taxes payable and purchases of supplies, shared services and capital items. Cash disbursements to Revco reduced the balance of the Intercompany Account. (GCC Ex. 2; Tr. pp. 46–55)

18. All of the Intercompany Profit for fiscal years ended on or prior to June 1, 1985 was returned to Revco in the form of dividends as shown in the Intercompany Account. For fiscal year ended June 2, 1984 a total of $256,686 of Intercompany Profit was returned to Revco as dividends and for fiscal year ended June 1, 1985, $499,869 of Intercompany Profit was similarly returned to Revco. (GCC Ex. 2; Tr. pp. 51–55)

19. While GCC was a member of the Consolidated Group the Intercompany Profit was not recognized by the Consolidated Group as income for federal income tax purposes because the transactions were amongst companies within the same group. (Tr. pp. 51–52) These profits were deferred for federal income tax purposes.

20. The income tax liability incurred by GCC while it was a member of the Consolidated Group was solely due to its earnings on sales other than to Revco. Although Revco paid this tax for GCC, the amount of the tax was charged to GCC on the Intercompany Account as income taxes payable and increased the intercompany liability to Revco. (GCC Ex. 2; Tr. pp. 53–54)

21. In structuring the IPO, the Underwriters determined that the maximum debt which GCC could carry after the IPO would be no more than $1,200,000. (GCC Ex. 9; Tr. pp. 395–396)

22. Consequently, at the time of the IPO, $1,200,000 of the amount owing from GCC to Revco on the Intercompany Account was reduced to a promissory note (the "Note") payable to Revco and the balance of the Intercompany Account was contributed to the capital of GCC. (GCC Ex. 1, pp. 5–6; GCC Ex. 9, pp. 2–3; Tr. pp. 56–57, 391, and 396)

23. The capitalization of the Intercompany Account owed by GCC to Revco contributed to an increase of Revco's tax basis in its shares of GCC stock. (GCC Ex. 4; Tr. p. 57)

24. The Intercompany Profit at March 4, 1986 was $1,393,976 which, when adjusted for timing and depreciation differences, resulted in earnings and profits for GCC for fiscal year 1986 of $1,359,605, which was then contributed directly to capital of GCC thereby increasing Revco's basis in its shares of GCC stock. (GCC Ex. 4; Tr. pp. 188–191)

25. As a result of the IPO, Revco's tax basis in its shares of GCC capital stock increased by $4,703,354, i.e., the contribution to GCC's capital of the sum of (i) the net outstanding balance of GCC's undistributed earnings and profits from its fiscal year 1980 through March 3, 1986 of $1,375,263, plus (ii) the outstanding amount payable in the Intercompany Account of $3,328,091. (GCC Ex. 4)

26. When, as part of the IPO, Revco sold 747,331 of its 1,068,750 shares of GCC capital stock (approximately 70%) for $8,781,627, it realized a gain for federal tax purposes of $5,398,622 ($8,781,627 sales proceeds less $3,383,005 basis in GCC stock). (GCC Ex. 4, p. 2; GCC Ex. 7; Tr. p. 192)

27. Consequently, on March 4, 1986 when Revco sold the 747,331 shares of its GCC stock Revco recovered $3,383,005 of its capital investment in GCC—a non-taxable event. (GCC Ex. 4, p. 2; Tr. p. 192)

28. Subsequent to the IPO, Revco sold the remaining balance of its GCC's shares. (Tr. p. 198)

29. As a result of the IPO, GCC was no longer a wholly owned subsidiary of Revco and ceased to be a member of the Consol-

idated Group for tax purposes. (Tr. pp. 55–56)

30. Once GCC ceased to be a member of the Consolidated Group, the deferred Intercompany Profit earned prior to fiscal year 1986 had to be recognized as taxable income in the Revco Consolidated Return. (Tr. pp. 58 and 74)

31. As a result of recognizing the Intercompany Profit of GCC for all years prior to fiscal year 1986 and through March 3, 1986 (the date prior to the IPO) the taxable income of GCC as reported on the Revco Consolidated Return was $2,112,010. (GCC Ex. 6; Tr. p. 59)

32. The Revco Consolidated Return reported consolidated taxable income of $71,434,868. (Revco Ex. 2, p. 4) The $71,434,868 included the $2,112,010 of taxable income of GCC. (Revco Ex. 2, p. 19; GCC Ex. 6) A total tax was calculated on the Revco Consolidated Return of $26,355,266.[1] (Revco Ex. 2, p. 4) The $26,355,266 included the tax on the $2,112,010 of taxable income of GCC. (Tr. pp. 229–230) Revco paid the entire $26,355,266 of the taxes calculated. (Tr. pp. 90, 229–230)

33. Subsequent to March 4, 1986, GCC began reporting and paying income tax separately because it was no longer a member of the Consolidated Group. (Tr. pp. 55–56)

34. GCC suffered the NOL in fiscal year 1988 after it left the Consolidated Group. (GCC Ex. 12, p. 2; GCC Ex. 13, p. 2; Tr. pp. 75 and 222)

35. Upon the filing of its federal income tax return for fiscal year 1988, pursuant to federal income tax laws GCC had the option to carry the NOL backward or forward. (Tr. pp. 80, 262–265, 361–362) GCC was under no constraint or obligation to carry the NOL back to the Revco Consolidated Return.

36. Under the federal tax laws, having elected a carry back, GCC was required to carry back the NOL first to its third previ-

ous tax year, then to its second previous tax year, etc. (Tr. pp. 263–264) GCC's third previous tax year was its June 2, 1985 through March 3, 1986 tax year for which its income was reported on the Revco Consolidated Return. (Tr. p. 264) Thus, the first $2,112,010 of the NOL was required to be applied to reduce the taxes due on the taxable income of the Revco Consolidated Group for the Revco Consolidated Return. (Tr. pp. 264–265) The NOL carry back of $2,112,010 to the Revco Consolidated Return reduces the amount of taxes due for that year by $971,524.60. This amount is easily calculated: the incremental tax rate for the 1986 tax year was 46% and 46% of $2,112,010 is $971,524.60. (Tr. pp. 243, 264–265)

37. Sometime early in 1989, GCC filed with the Internal Revenue Service a Form 1139 "Corporation Application for Tentative Refund," (Application for Refund) requesting a tentative refund of $403,234 based on carrying back $2,112,010 of the NOL to the Revco Consolidated Return. (GCC Ex. 12; Tr. p. 221) GCC elected to carry back the NOL based on the assumption that it would receive a tax refund of $403,234 from the IRS. (Tr. pp. 360–362) GCC concedes that it is not entitled to any portion of the tax refund in excess of $403,234.00. (Tr. pp. 250–253, 308)

38. By carrying back the NOL, GCC gave Revco the opportunity to seek a windfall tax refund of $568,291—the difference of $971,525 less $403,234. (Tr. pp. 299–301) By filing an amended corporate federal income tax return, Form 1120X, Revco could obtain the balance of the tax refund. (Tr. p. 265)

39. The above opportunity for a tax refund by Revco arises solely as a result of GCC's decision to carry back the NOL. An election by GCC to carry forward the NOL would deprive Revco of the opportunity to seek its tax refund of $568,291. (Tr. p. 311)

---

1. Importantly, there is no evidence to suggest that a formal election was made by the Group with respect to the allocation of tax liability under Treas.Reg. § 1.1552–1(a). Pursuant to Treas.Reg. § 1.1552–1(d), the failure to elect a method of tax allocation binds a consolidated group to allocate tax liability in accordance with the method prescribed under Treas.Reg. § 1.1552–(a)(1), *i.e.*, based upon the relative taxable incomes of the members.

40. The Revco Consolidated Return is currently under audit by the IRS. However, testimony by Mr. Steven Gruber, Vice President, Taxes of Revco, has indicated that the GCC portion of the Revco Consolidated Return is not currently being questioned by the IRS, nor is there any evidence to suggest that it will be. (Tr. pp. 373–375)

41. Mr. Alexander Hamm, a tax partner in the accounting firm of Peat, Marwick, Main & Co., testified that the likelihood of an IRS audit of either the Revco Consolidated Return or of GCC's corporate income tax return for fiscal year 1988 resulting in a change to the amount of the Refund is remote and highly unlikely. Revco offered no testimony or evidence to contradict the testimony of Mr. Hamm. (Tr. pp. 294–295, 310)

42. At present, there has been no examination of the 1988 GCC income tax return. (Tr. pp. 86–87, 229)

43. The IRS has filed a proof of claim against Revco in the amount of $100,548,-444.73, of which $30,696,761.00 in taxes and $2,191,632.98 in interest relates to the Revco Consolidated Return. (Revco Ex. 4; Tr. pp. 383–384)

44. The testimony of Mr. Gruber indicates his belief that the Revco Consolidated Return (Revco Ex. 2) accurately reflects in every respect the proper amount of tax due the IRS for the period involved. (Tr. pp. 379–380)

45. The federal tax laws permit the IRS to elect to deal directly with any member of a consolidated group, which, upon such election has full authority to act for itself. See Treas.Reg. § 1.1502–77, the last sentence of which provides:

Notwithstanding the provisions of this paragraph, the district director may, upon notifying the common parent, deal directly with any member of the group in respect of its liability, in which event such member shall have full authority to act for itself.

46. The evidence establishes that all of the intercompany profit on sales from GCC to Revco was added to the capital, i.e. tax basis, of Revco's investment in GCC (Tr. pp. 51–55, 72) Further, Note 1 on page 1 of GCC Exhibit 4 which reads "No FIT (i.e. Federal Income Taxes) provision is necessary because the same amount would be contributed to paid in capital and increase the tax basis (a wash)" clearly shows that the tax on such income remains included in the amount capitalized. (Tr. pp. 66–67) Finally, the journal entries submitted as part of GCC Ex. 3 clearly show that the tax computed on the initial calculation of the fiscal year 1986 intercompany profit, i.e. $342,469, was capitalized. No evidence has been presented to question the capitalization of such amounts.

47. If, for any reason, any amount of the Refund is determined by the IRS not to have been due, then Revco and all other members of the Consolidated Group are severally liable to repay to the IRS any overpayment plus any interest and applicable penalties. (Tr. pp. 241–242) [Treas.Reg. § 1.1502–78(b)(2)]

48. GCC presently owes Revco $575,-000.00 on the Note. (Tr. pp. 117–118, 127–129, 155)

### ISSUE

### WHICH OF THE TWO ENTITIES, REVCO OR GCC, IS ENTITLED TO RECEIVE THE REFUND?

### THE CROSS–CLAIMS

GCC contends that it is entitled to receive the Refund based on the following grounds: 1) Although Revco initially paid the tax Revco was fully reimbursed for the payment through the sale of Revco's GCC stock and its recovery of the tax as part of the tax-free return of its capital investment in the GCC stock; 2) Any refund resulting from the carry back of a net operating loss of a former subsidiary against taxable income attributable to such subsidiary in a prior year when it was a member of its former parent corporation's consolidated tax group belongs to and is the property of that subsidiary. GCC relies on the following case law for this position *Western Dealer Management, Inc. v. England, (In re Bob Richards Chrysler–Plymouth Corp.),* 473 F.2d 262 (9th Cir.1973), *cert.*

*denied,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); *Jump v. Manchester Life and Casualty Corp.,* 579 F.2d 449 (8th Cir.1978); *United States v. Bass Financial Corp., et al.,* No. 83 C 706 (N.D.Ill. May 27, 1983 and April 20, 1984); and, *Pentron Industries, Inc. v. Capital Dredge and Dock Corp., et al.,* Nos. 3140 and 3142 1981 WL 3984 (Court of Appeals, Lorain County, May 20, 1981); and 3) The Refund, although made payable to Revco, is subject to a constructive trust in favor of GCC and to permit Revco to receive any portion of the Refund would unjustly enrich Revco.

Revco argues that GCC is not entitled to the Refund because: 1) GCC did not pay the tax or reimburse Revco for paying the tax, and relies on *Jump, Bob Richards,* and *Bass Financial, supra* for this position; 2) No constructive trust exists because the Refund was not GCC's money in the first instance; 3) There is no evidence of an agreement between Revco and GCC to give GCC any tax refunds; 4) Revco is entitled to set off any amount due to GCC against the balance of the Note due to Revco; 5) Revco is entitled to keep the refund as partial compensation for GCC's deliberate failure to obtain the balance of the Refund due; and 6) GCC should not be awarded the Refund as long as Revco and other debtor-members of the Consolidated Group remain contingently liable to repay the Internal Revenue Service.

## CONCLUSIONS OF LAW

■ This Court concludes that GCC has presented persuasive facts and law and is entitled to receive the Refund. The case law relied upon by both GCC and Revco clearly establishes that the Refund is the property of GCC. The Ninth Circuit Court of Appeals stated in *Bob Richards, supra,* on page 265:

> Absent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member. Allowing the parent to keep any refunds arising solely

from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.

In *Bob Richards* the debtor was a wholly owned subsidiary of a parent corporation. A trustee was appointed in the case. The parent corporation did not file bankruptcy and was an unsecured creditor of the debtor. The parent corporation and debtor filed consolidated federal income tax returns for the years 1965 and 1966. In 1966 the group was entitled to a refund resulting from the carry back of a net operating loss. The entire refund was due to the earnings history of the debtor. *Id.* at 263.

Although not an issue on appeal, the court discussed the reasons why the refund properly belonged to the trustee. There was no evidence that the debtor or trustee voluntarily assigned its rights to the refund to the parent corporation. The Internal Revenue Code did not compel the conclusion that a tax refund must inure to the benefit of the parent company or the company which sustained the loss that makes the tax refund possible. *Id.* at 264. The parties had made no agreement concerning the ultimate disposition of the tax refund. *Id.* at 265. The tax refund was paid to the parent corporation, as sole agent for the consolidated group, in conformance with income tax regulations. The Circuit Court concluded that since there was no agreement that the parent corporation had any right to keep the refund the parent corporation was acting as a "trustee of a specific trust and was under a duty to return the tax refund to the estate of the bankrupt." *Id.* at 265.

In *United States v. Bass Financial Corp., et al.,* No. 83 C 706 (N.D.Ill. April 20, 1984) the receiver of a wholly owned subsidiary of Bass Financial Corporation ("Bass") was allowed to recover the portion of an income tax refund attributable to the offsetting of the subsidiary's loss against its own prior income. Bass claimed it was entitled to a portion of the refund as it paid for expenses that were the obligation of the subsidiary. The court found Bass

presented inadequate evidence to demonstrate the expenses were those of the subsidiary and stated that even if Bass could prove it was entitled to reimbursement for payment of the expenses, such claims were "not important to the issue of ownership of the tax refund." *Id.* at 5. The court concluded that Bass would be unjustly enriched if it were allowed to assert a claim against the tax refund. *Id.*

In *Jump v. Manchester Life and Casualty Corp.*, 579 F.2d 449 (8th Cir.1978), the issue on appeal was stated on page 450:

> [W]hether an insolvent subsidiary of an affiliated corporate group is entitled to share in a group consolidated federal income tax refund generated largely by the subsidiary's losses, in an amount larger than the subsidiary's own income tax payments.

The District Court permitted the subsidiary to recover a portion of the refund up to the amount of taxes it paid for the years in question. The Circuit Court affirmed this judgment but did not address the issue of what type of circumstances entitled a subsidiary to its pro rata portion of a consolidated refund paid to the parent. *Id.* at 454.

In the matter *sub judice* Revco initially paid the tax for fiscal year ended May 31, 1986 but was subsequently reimbursed for the tax paid. (Findings Nos. 20, 32) While Revco paid the tax liability, the amount of tax allocated to GCC was charged to GCC on the Intercompany Account as income taxes payable and increased GCC's liability to Revco. (Finding No. 20) At the time of the IPO, GCC's total intercompany liability to Revco, which included the amount due for federal income taxes, was reduced to the Note payable to Revco and the balance was contributed to the capital of GCC stock. Revco's tax basis in its shares of GCC stock was increased by the capitalization of the Intercompany Account. (Findings Nos. 22, 23) Revco was fully reimbursed for any tax liability paid for GCC by receiving the Note and the proceeds of the sale of GCC stock. (Findings Nos. 22, 25–27) The NOL carried back to the Revco Consolidated Return is entirely attributable to GCC (Finding No. 34, 36) and the refund amount sought, $403,234.00, is the proportion of income taxes paid by income generated by GCC. (Finding Nos. 31, 36) No express or implied agreement existed between GCC and Revco regarding the ultimate disposition of any tax refund. (Findings Nos. 12, 13) Based upon these factual findings and an application of the case law authority discussed earlier, it is the conclusion of this Court that GCC is entitled to the Refund.

■ Revco's contention that it is entitled to the Refund as partial compensation for GCC's failure to obtain the balance of the Refund due is unsound. Revco claims GCC's action in seeking only the amount of Refund due GCC was inequitable conduct. The court finds no inequitable conduct by GCC. When GCC filed the Application for Refund it sought only the refund which it determined it was entitled to. (Finding No. 37) Revco has the option to file an amended corporation federal income tax return (Form 1120X) to obtain the balance of the tax refund it claims is due it. (Finding No. 38)

■ Similarly, Revco's contention that GCC should not be awarded the Refund as long as Revco and other debtors are contingently liable to repay the IRS is without merit. Revco suggests the Refund be held in the Revco estate, subject to Court order, or returned to the IRS until a final determination that a refund is due. Revco presents no authority or case law to support this position. GCC cites *Bass Financial Corp., supra,* wherein the refund check was issued and the Court decision awarding the refund to the subsidiary was rendered while the tax return for the loss year was still subject to examination.

This Court is persuaded by the testimony presented by GCC that the GCC portion of the Revco Consolidated Return is not currently being questioned nor is there any evidence to suggest that it will be. (Finding No. 40) Alexander Hamm, tax partner of Peat, Marwick, Main & Co., testified that an IRS audit of the Revco Consolidated Return or GCC's 1988 return resulting in a change to the amount of the Refund is

remote and highly unlikely. Revco did not offer any testimony or evidence to contradict this testimony. (Finding No. 41) Indeed, the evidence establishes that any chance of a change in the Refund amount is slight. The Court will not decline to award the Refund to GCC based on mere speculation that a change in the tax liability may occur sometime in the future.

Revco further argues that it is entitled to setoff any amount due to GCC against the $575,000 that GCC currently owes to Revco on the Note. (Finding No. 48) GCC argues that the Refund is not subject to any right of setoff by Revco as no mutuality of debts exists.

■ Section 553(a) of the Bankruptcy Code, 11 U.S.C. § 553(a), speaks of the setoff of a "mutual debt" owed by a creditor to the debtor. Mutuality is a requirement for any right of setoff. *4 Collier on Bankruptcy* (15th Ed.1989) ¶ 553.04 at 553–17. "The basic test is mutuality, not similarity of obligation—something must be 'owed' by both sides." *Id.* at 553–18.

■ When the debt to be setoff arose between the parties acting in differing capacities the requisite "mutuality of the debt" does not exist. As stated in *4 Collier on Bankruptcy* (15th ed. 1989) ¶ 553.04 at 553–21, 22:

> In general, where the liability of the one claiming a setoff arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts does not exist, and such person may not set off a debt owing from the debtor against such liability.

> .    .    .    .    .

> A debtor's parent corporation, which filed a consolidated tax return and received a tax refund attributable to the debtor's prepetition operations, holds the refund in trust for the debtor and is not permitted to set off the amount of the refund against its claim.

*See, also, Bob Richards, supra,* where the parent corporation sought to setoff the tax refund attributable to the subsidiary against the prepetition debt owed it by the subsidiary. The District Court held that no mutuality of debts existed and setoff could not occur. The Circuit Court affirmed this ruling and stated on page 265:

> The rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt. The trust res is not owing to the bankrupt's estate but rather is owned by it. *Fore Improvement Corp. v. Selig,* 278 F.2d 143, 145 (2nd Cir.1960).

In the instant matter, the Refund was made payable to Revco, but this Court has concluded that the Refund is clearly the property of GCC. Revco is listed as payee on the check merely as an agent for the Consolidated Group members. Revco does not "owe" the Refund to GCC. No mutuality exists for a setoff to occur.

■ Revco's last argument is that GCC is not entitled to the Refund as there is no evidence of any agreement for GCC to receive any tax refunds subsequent to the IPO. This argument is without merit and is unsupported by case law. The case law cited earlier holds that absent an agreement *to the contrary* any refund resulting from the carryback of a net operating loss of a former subsidiary against taxable income attributable to the subsidiary in a prior year when it was a member of its former parent corporation's consolidated tax group belongs to and is the property of that subsidiary. *Bob Richards, Jump, Pentron Industries,* and *Bass Financial, supra.* No evidence of any agreement as to disposition of any tax refunds was presented to the Court and Revco withdrew the argument at the trial. (Finding No. 13) As no agreement contrary to established case law was presented by Revco, this argument must fail.

This Court concludes that the Refund is the property of GCC and the cross-claim of GCC should be granted. This Court further concludes that the United States of America should be dismissed as a party to this adversary proceeding. A separate Order shall be entered in accordance with

these Findings of Fact and Conclusions of Law.

