In the Matter of FLORIDA PARK
BANKS, INC., Debtor.

FEDERAL DEPOSIT INSURANCE
CORPORATION, As Receiver
of Park Bank of Florida, Plaintiff,

v.

William BRANDT, As Trustee
Defendant.

No. 86–00547–8B7.
Adv. No. 88–0535.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 21, 1990.

Robert A. Soriano, Tampa, Fla., for Federal Deposit Ins. Corp.

William Brandt, Trustee.

Robert Mellen, III, and Margaret W. Hull, Orlando, for defendant/trustee.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

THOMAS E. BAYNES, Jr.,
Bankruptcy Judge.

THE MATTER under consideration in the above-captioned adversary proceeding is an action for declaratory judgment under Title 28 U.S.C. §§ 2201 and 2202 brought by the Plaintiff, Federal Deposit Insurance Corporation (FDIC) to determine whether income tax refunds due from the Internal Revenue Service (IRS) and the State of Florida are property of FDIC or property of the bankruptcy estate. On July 19, 1989, FDIC filed a Motion for Summary Judgment in this adversary proceeding. The Court heard FDIC's Motion for Summary Judgment and granted partial summary judgment as to the amounts FDIC and Defendant, William Brandt, as Trustee for the Debtor, Florida Park Banks, agreed as belonging to FDIC. The only remaining issue is whether FDIC, as successor to Park Bank,[1] or the Trustee for Florida Park Banks is entitled to tax refunds resulting from a 1985 loss carryback.

The Debtor, a holding company, along with its wholly owned subsidiary, Park Bank, and other subsidiaries (collectively referred to as the consolidated group) filed a consolidated federal tax return for the 1985 tax year. The consolidated return showed a net operating loss of $18,787,-

---

1. FDIC was appointed receiver of Park Bank by the Comptroller of the State of Florida.

833.00 which was comprised of the following losses[2] incurred by members of the consolidated group:

| | |
|---|---|
| Florida Park Banks (Debtor) | ($ 2,327,750) |
| Park Banks of Florida (now FDIC) | ( 13,898,589) |
| Park Capital Management (Subsidiary of Park Bank) | 8,904 |
| Park Real Property (Subsidiary of Park Bank) | ( 2,564,658) |
| Park Financial (Subsidiary of Park Bank) | ( 5,740) |
| Total Net Operating Loss | ($18,787,833) |

The net operating loss was then carried back[3] to tax years 1983, 1982, 1980, and 1979 and offset against the income of Park Bank for each of those years.[4] This offset resulted in a refund of taxes, all of which had been previously paid by Park Bank.

FDIC, contends it is entitled to the entire refund of taxes. In support, it argues the refund is entirely the result of losses incurred in 1985 by Park Bank and its subsidiaries being offset against the income of Park Bank in the prior years. In addition, FDIC points out Park Bank alone had sufficient losses in 1985 to generate the entire tax refund and none of the Debtor's losses in 1985 were needed to offset income of Park Bank. FDIC further contends the filing of a consolidated federal tax return was an administrative convenience and in no way affected the allocation of a tax refund. FDIC denies that "policy statements" set out in the minutes of the board of directors' meetings of the Debtor and Park Bank constitute an agreement to allocate tax refunds.

FDIC supports its position by *In re Bob Richards Chrysler–Plymouth Corp.*, 473 F.2d 262 (9th Cir.1973) *cert. denied sub nom. Western Dealer Management, Inc. v. England*, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); and *Jump v. Manchester Life and Casualty Managements*, 438 F.Supp. 185 (E.D.Mo.1977), *aff'd*, 579 F.2d 449 (8th Cir.1978). In *Bob Richards*, the Court refused the parent corporation's contention it should be entitled to the tax refund resulting from the carryback of a net operating loss. The parent company paid no taxes nor incurred any losses during the years in question. The Court stated the parent corporation's receipt of the refund from the Government was only in its "capacity as an agent for the consolidated group" and held on the theory of "unjust enrichment" the parent corporation was not entitled to any of the refund.

In the *Jump* case, a subsidiary argued it should be entitled to the entire tax refund generated by the carryback of its losses against income of other members of the consolidated group. The Court held the subsidiary was entitled to only the part of the refund which represented unrecovered taxes previously paid by the subsidiary. Because both the losses of the subsidiary and the income of the other members in the consolidated group were necessary to generate a refund, absent an agreement otherwise, the subsidiary was entitled to a refund only of taxes it had previously paid.

William Brandt, as Trustee for the Debtor, contends the refund should be allocated between the Debtor and Park Bank in the same proportion as each entity's loss is compared to the total loss. Specifically, the Trustee takes the position Park Bank's (FDIC) portion should only be 87.61% of the refund because Park Bank's 1985 net operating loss of $16,460,083.00 represents 87.61% of the total loss of $18,787,833.00. The Trustee further argues the remaining 12.39% of the refund belongs to the bankruptcy estate[5] because the Debtor's 1985 loss of $2,327,750.00 represents 12.39% of the total net operating loss for the consolidated group.

■ The basis for the Trustee's contention that the refund should be allocated in

---

**2.** One Park Bank subsidiary, Park Capital Management, had income of $8,904.00.

**3.** Pursuant to Internal Revenue Code Section 172 authorizing deductions for carrybacks and carryovers of net operating losses.

**4.** Park Bank was the only member of the consolidated group to have income to offset in the carryback years.

**5.** The Trustee only argues that 12.39% of the refunded taxes paid in 1982, 1983, and 1984 belong to the bankruptcy estate.

proportion to the losses is the existence of "policy statements" which appear in the minutes of the board of directors' meetings for both the Debtor and Park Bank. The Trustee relies on these "policy statements" as binding agreements between the Debtor and Park Bank as to the filing of consolidated returns and the allocating of refunds, if any, resulting from the consolidated returns.

The Trustee argues the board's resolution regarding the allocation of tax refunds should govern in this case. Since consolidated returns were filed in compliance with the board's resolution, then, according to the Trustee, compliance with the board's policies regarding the allocation of tax refunds should follow.

This Court is not convinced there is any binding agreement between the Debtor and Park Bank as to the allocation of taxes refunded due to the filing of a consolidated tax return. The filing of a consolidated tax return by affiliated corporations does not per se affect the entitlement of tax refunds between those corporations.[6] The corporations can by agreement allocate tax refunds which result from the filing of a consolidated tax return.[7] In the instant case the Court does not find such an agreement existed between the parties.

The Trustee relies on "policy statements" adopted by the board of directors of both the Debtor and Park Bank to constitute the agreement. The "policy statement" of the Debtor reads as follows:

Florida Park Banks, Inc. [Debtor] and subsidiaries file federal and state income tax returns on a consolidated basis. The subsidiaries of Florida Park Banks, Inc. (the 'holding company') will periodically remit payments to the holding company as a result of the income tax liability of the subsidiaries.

The periodic payments made by the subsidiaries to the holding company shall equal the amount of tax payments the subsidiaries would have remitted to the taxing authorities had a tax return been filed by each subsidiary on an unconsolidated basis. The subsidiaries will remit such payments to the holding company at the approximate time that estimated payments or income tax returns are submitted to the taxing authorities by the holding company.

In the event that a *subsidiary* incurs a taxable loss, the *holding company will reimburse the subsidiary* to the extent that there is a tax benefit arising from the loss in the consolidated income tax return. (emphasis added)

The "policy statement" of Park Bank reads substantially the same.

The problem this Court has with elevating the "policy statements" to a binding agreement is basic. As pointed out by FDIC, too many essential components of the agreement appear to be missing. For instance, questions regarding the effective date of the agreement; which subsidiaries would file consolidated returns; and whether Park Banks' subsidiaries would also file consolidated returns are not addressed in the policy statements. Other questions arise when considering the language of the "policy statement", for instance, "... holding company will reimburse subsidiary to be the extent of tax benefits arising from the use of loss ..." Is a "tax benefit" just a refund of prior paid taxes, or does a reduction in tax liability or the availability of losses for future use constitute a tax benefit also?

Even assuming the policy statements do constitute an agreement allocating the tax refund, this Court finds the agreement does not provide for any reimbursement to the Debtor for the use of its losses resulting in a tax benefit. Specifically, the Debtor's "policy statement" reads "In the event that a subsidiary incurs a taxable loss, the holding company [Debtor] will reimburse the subsidiary ..."; and Park Banks' statement reads "In the event the bank [Park Bank] incurs a loss, the bank [Park Bank] will be reimbursed by the holding company [Debtor] ...". No mention is made in either statement that the holding company (Debtor) will be reimbursed for the use of any losses it may incur.

---

**6.** *See,* Treas.Reg. § 1.1502–1 through § 1.502–100.

**7.** *Id.*

Since this Court finds there is no agreement between the parties as to the allocation of tax refunds, we must now determine how the tax refund resulting from the 1985 net operating loss should be allocated. When one member of a consolidated group has only net operating losses and another member has only income, it would necessarily require both members' respective income and losses to generate a refund of prior year taxes. Given those facts, either member filing a tax return on its own could not generate a tax refund. However, the instant case does not involve exactly those unresolved facts in spite of the Trustee's suggestion to the contrary.

An analysis of the facts of the present case juxtaposed to either *Bob Richards* or *Jump* leads this Court to the conclusion Park Bank is entitled to the entire refund. In this case, Park Bank could have generated the same tax refund with or without the use of the Debtor's losses. Under the *Bob Richards'* rationale, Park Bank would be entitled to the entire refund because Park Bank's losses are offset against its own income and to allow the Debtor a share of the refund would "unjustly enrich" the Debtor since it paid none of the refunded taxes. Using the *Jump* rationale, because both Park Bank and the Debtor have losses in 1985, each member should be entitled to recover only taxes it had previously paid. Again, Park Bank would be entitled to the entire refund since only Park Bank paid the refunded taxes.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment is granted and FDIC is entitled to the entire tax refund resulting from the consolidated group's 1985 net operating loss carryback as well as any interest attributable to the refunds. By separate order of this Court, a Final Judgment will be entered.

DONE AND ORDERED.