United States Court of Appeals,

Fifth Circuit.

No. 91–3085.

CAPITAL BANCSHARES, INC., Plaintiff–Appellant/Cross–Appellee,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Intervener–Appellee, Cross–Appellant,

v.

UNITED STATES OF AMERICA, Defendant.

April 3, 1992.

Appeal from the United States District Court for the Middle District of Louisiana.

Before REYNALDO G. GARZA, GARWOOD and DUHÉ, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

## PRELIMINARY STATEMENT

This complicated and involved litigation involves the right to tax refunds paid by the Internal Revenue Service ("IRS") due to losses sustained by a now bankrupt subsidiary of plaintiff parent. For the reasons stated below, we affirm the summary judgment of the district court in favor of the Federal Deposit Insurance Corporation ("FDIC") that the refund is the property of the bankrupt. We reverse, however, the district court's award of attorney's fees to the parent.

## BACKGROUND

Capital Bancshares, Inc. ("Bancshares") is the common parent of an affiliated group of corporations and owns 100% of the outstanding stock of Capital Bank and Trust Co. ("Bank"), a member of the group. Pursuant to the provisions of Internal Revenue Code ("IRC") § 1501, Bancshares regularly filed consolidated federal income tax returns for the affiliated group.[1]

---

[1] IRC § 1501 provides:

> An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated

The Bank was chartered under the laws of Louisiana in 1955. Prior to 1980, the Bank was the parent corporation of the affiliated group and filed consolidated federal income tax returns on behalf of the group. According to the federal income tax returns filed by the group, in 1975, the group consisted of the Bank along with Capbank Computer Corporation ("Computer"); Collection Accounts, Inc.; and Capbanc Building Corporation. All were wholly owned subsidiaries of the Bank. The group also included Capbanc Leasing Corporation (then a wholly-owned subsidiary of Computer). Main Street Development Corporation was added to the group in 1977 as a wholly owned subsidiary of the Bank.

In 1980, Bancshares was formed and acquired all of the outstanding common stock of the Bank, thus becoming the parent corporation of the group. Capital Equity Corporation was added to the group in 1982 as a wholly-owned subsidiary of the Bank. In 1984, Computer became a wholly-owned subsidiary of Bancshares, rather than the Bank, and Capbanc Leasing Corporation became a wholly-owned subsidiary of the Bank, rather than Computer. Also in 1984, the Debbie Corporation ("Debbie") was added to the group as a wholly-owned subsidiary of Bancshares.

In April, 1986, due to losses sustained by the affiliated group, Bancshares filed claims for refunds of taxes paid during the calendar years 1972 and 1975 through 1981. Under IRC § 6532(a)(1), the IRS is given six months within which to allow or disallow claims for refund. On July 22, 1986, the IRS informed Bancshares that it had all of the necessary forms for determination of the claim for the refund and that the claim would be submitted for examination. The IRS, however, did not commence the examination until at least April of 1987.

---

return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

On October 30, 1987, the Commissioner of Financial Institutions for the State of Louisiana declared the Bank to be in an unsafe and unsound condition. The Commissioner appointed the FDIC as receiver and liquidator of the Bank pursuant to La.R.S. § 6:391(B). At that point, all of the Bank's assets passed to the FDIC according to La.R.S. § 6:391(C).

Also on October 30, 1987, the FDIC formed the Capital Bank & Trust Co., National Association ("Bridge Bank") to acquire the assets of the Bank pursuant to Section 2[11](i) of the Federal Deposit Insurance Act,[2] which authorizes the FDIC to place the assets of a failed bank into a newly-formed bridge bank pending ultimate disposition of the assets.

At the time of the closing of the Bank, the Bank owned all of the common stock of all the members of the group except for Bancshares' and Bancshares' wholly-owned subsidiaries, Computer and Debbie.

On February 22, 1988, in response to Bancshares' inquiry of February 16, 1988, the IRS examining agent informed Bancshares that he was in the process of completing the examination. On March 1, 1988, however, the IRS informed Bancshares that there could be further delays.

Bancshares filed this suit on March 15, 1988, to require the United States to pay Bancshares a refund of approximately $4.6 million comprising consolidated federal income taxes previously paid by Bancshares and its subsidiary corporations, together with accrued interest, attorneys' fees and costs. The FDIC filed a motion to intervene in this suit on April 26, 1988, claiming that the refund was the property of the Bank, and that the Bank had transferred its rights to the refund to the FDIC. The district court granted the FDIC's motion on June 17, 1988, over Bancshares' objection.

On April 6, 1988, the FDIC and the Bridge Bank entered into an agreement with Sunburst

_____

[2]12 U.S.C. § 1821(i).

Bank, pursuant to which Sunburst Bank assumed all of the Bridge Bank's liabilities in exchange for most of the assets of the Bridge Bank and a pledge of financial assistance from the FDIC. The FDIC reserved the right to tax refunds.

On August 11, 1988, the United States answered Bancshares' complaint stating generally that it lacked knowledge as to the correctness of the allegations contained in the complaint and denying all allegations contained in the exhibits attached thereto which were not specifically admitted in the United States' answer.

On May 5, 1989, the FDIC filed a Motion to require the United States to interplead the tax refunds in question. On May 12, 1989, the IRS submitted a report to the Joint Committee on Taxation allowing the claims for refunds as filed. In its ruling on June 15, 1989, the district court denied the FDIC's Motion to Interplead the refund.

On June 20, 1989, the Chief of Staff of the Joint Committee on Taxation signed a letter to the Acting Commissioner of the IRS indicating that there was no objection to payment of the proposed refunds to Bancshares.

On July 5, 1989, the FDIC filed a Motion for Summary Judgment against Bancshares, seeking to have any refunds paid by the United States paid directly to the FDIC. Bancshares filed a Motion for Partial Summary Judgment against the United States on July 14, 1989, to require it to pay the income tax refunds to Bancshares pursuant to the provisions of section 1501 of the Internal Revenue Code and the accompanying Treasury Regulations. The United States answered that it did not dispute the fact that certain tax refunds were due. The United States did, however, request the court to deny Bancshares' motion insofar as it required the United States to pay any refunds directly to Bancshares. On August 16, 1989, Bancshares filed an opposition to the FDIC's Motion for Summary Judgment on the grounds that the FDIC had not carried its burden of proof on all fact elements. On

December 4, 1989, the district court granted Bancshares' Motion for Summary Judgment against the United States, ordering it to pay to Bancshares the refunds as set out in Bancshares' complaint, together with accrued interest. The district court also denied the FDIC's Motion for Summary Judgment against Bancshares.

Bancshares placed the refunds and accrued interest which it ultimately received from the United States in an interest-bearing escrow account pending the final determination of the competing claims.

On March 16, 1990, the FDIC filed a Second Motion for Summary Judgment against Bancshares', which Bancshares opposed. On July 19, 1990, Bancshares filed a Motion for Summary Judgment on allocation of the income tax refunds.

On December 18, 1990, the district court granted the FDIC's Second Motion for Summary Judgment, ordering Bancshares to account for and pay over to the FDIC the entirety of the income tax refunds, plus accrued interest. On December 28, 1990, Bancshares filed a Motion for Partial New Trial to recover attorneys' fees and costs advanced in connection with obtaining the income tax refunds from the United States. On January 17, 1991, Bancshares filed a Notice of Appeal of the district court's summary judgment in favor of the FDIC.

On March 18, 1991, the district court awarded Bancshares' $62,999.37 in attorneys' fees and costs incurred in connection with the attainment of the refunds from the United States. After the disposal of its Motion for Partial New Trial, on April 17, 1991, Bancshares filed a Second Notice of Appeal of the district court's judgment rendered on December 18, 1990. The FDIC cross-appealed the award of attorneys' fees to Bancshares.

ANALYSIS

In reviewing a summary judgment, we apply the same standard of review as did the district court. *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989). Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

I. *The Refund is the Property of the Bank.*

As Bancshares points out, the Internal Revenue Code is silent as to whether "a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving." *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp., Inc.),* 473 F.2d 262, 264 (9th Cir.) (*quoting Western Pacific R.R. Corp. v. Western Pacific R. Co.,* 197 F.2d 994, 1004 (9th Cir.1951), *rev'd on other grounds,* 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1954)), *cert. denied sub nom Western Dealer Management, Inc. v. England,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973). Bancshares argues that in the absence of express federal law, state law governs. Therefore, Bancshares reasons, under state law the Court should defer to Bancshares' proposed allocation of the refund pursuant to the Business Judgment Rule. Under this familiar rule of American jurisprudence, the courts refrain from second guessing business decisions made by corporate directors in the absence of a showing of fraud, unfairness or overreaching.

Bancshares is correct in that the courts will not question an allocation which results from an express agreement, or an agreement which is clearly implied. No such agreement exists in this case, however. The fact that the group remitted their taxable income to Bancshares each year so that it could make a consolidated tax payment and receive a consolidated return does not imply an allocation scheme. As the Ninth Circuit pointed out in the seminal case of *In re Bob Richards,* this is merely a procedural device relied on by the IRS. 473 F.2d at 265. In that case, WDM, a parent corporation, filed a consolidated income tax return at the close of a year in which its wholly owned subsidiary Bob

Richards created a refund of $10,063.25 for the consolidated group. WDM was an unsecured creditor of Bob Richards in the amount of $45,000. Thus, when WDM received the $10,063.25 refund, it claimed that it was entitled to keep the refund as a set-off against the $45,000 Bob Richards owed.

The Ninth Circuit held that the Trustee in Bankruptcy was entitled to the refund. The Court noted that the Trustee had acquired whatever rights the bankrupt had in the prospective refund, and that mere consent to the filing of a consolidated return could not be construed as an assignment of the bankrupt's rights to WDM. *Id.* at 264. The Court held that, in the absence of an allocation agreement, allowing a parent to keep refunds arising solely from a subsidiary's losses would constitute unjust enrichment. *Id.* at 265. The Court found that since the IRS regulations allowing for consolidated filings and returns did not govern subsequent allocations,[3] in the absence of an agreement to the contrary, the parent corporation "was acting as trustee of a specific trust." *Id.*

In a similar case, the court held "that the conservator of a bankrupt subsidiary has a right to recover an income tax refund channeled through a parent company filing a consolidated return,...." *Jump v. Manchester Life & Cas. Management Corp.,* 438 F.Supp. 185, 188–89 (E.D.Mo.1977), *aff'd,* 579 F.2d 449 (8th Cir.1978). Quoting *In re Bob Richards,* 473 F.2d at 265, the *Jump* court stated that the amount which it held to be the property of the bankrupt subsidiary was

> a tax refund resulting solely from off-setting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year [which] should inure to the benefit of that member.

438 F.Supp. at 189.

The district court also held

---

[3]*See* Treasury Regulation § 1.1502–77.

that this right is limited to the recovery which the subsidiary would have had if it had filed individual returns throughout, so that plaintiff's recovery here is limited to the amount previously paid in taxes.

*Id.*

In *Jump,* the Superintendent of Insurance for the State of Ohio who served as conservator and liquidator of an insolvent subsidiary sued to collect a $811,450.36 tax refund which the IRS paid to the parent in May of 1985 due to losses sustained by the subsidiary. The district court found in favor of the Superintendent, but only in the amount of $30,250.00. In early 1974, the IRS had paid the parent a $703,255.00 refund for losses sustained by the subsidiary, and the parent had paid the refund to the subsidiary. Since 1970, the subsidiary had paid $733,505.00 to the parent for tax purposes. The district court, following the reasoning of *In re Bob Richards,* held that the subsidiary was not entitled to the full refund, but only to the difference between the taxes it had previously paid and the amount of the previous refund.

The Superintendent appealed, claiming that the subsidiary was entitled to the full amount of the refund. In affirming the district court, the Eighth Circuit found, however, that the refund was an asset of the subsidiary only to the extent that it could be used to offset tax payments. As the subsidiary was no longer a going concern and would pay no future taxes, the subsidiary could claim only that amount that would recompense it for taxes paid previously. To allow it to collect taxes previously paid by *other* members of the consolidated group simply because the subsidiary had a bad year would unjustly enrich it. 579 F.2d at 453. We note that several bankruptcy courts in other circuits have adopted the reasoning of *Jump* and *In re Bob Richards. See, e.g., United States v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 111 B.R. 631 (Bkrtcy N.D.Ohio 1990); *FDIC v. Brandt (In re Florida Park Banks, Inc.),* 110 B.R. 986 (Bkrtcy M.D.Fla.1990).

We believe that the reasoning of the above cited cases is sound and applies to the facts of the case before us. The group sought to apply the 1985 loss for refunds of taxes paid from 1975 through

1981. According to IRC § 172, the group could carry only the Bank's losses back more than three years. Therefore, the loss was entirely attributable to the Bank. Moreover, it is undisputed that the Bank was profitable every year from 1975 until its 1985 loss, and paid to Bancshares a sum greater in the aggregate than the disputed refund for its annual tax contribution. Therefore, the Bank could have generated the refund on its own had it filed income taxes separately from the group. Following the *In re Bob Richards* reasoning, the refund is the property of the Bank in the absence of a contrary agreement. We further note that Bancshares showed only losses during the relevant period, and could not have generated any tax refund on its own. To allow Bancshares to keep the refund generated by the Bank would unjustly enrich the parent.

Bancshares claims that it should retain the funds due to equitable considerations. Bancshares claims that, due to the Bank's unsatisfactory primary capital position, Bancshares was required to borrow substantial amounts of money from third party lenders for the benefit of the Bank. Bancshares assigned a portion of the tax refund claims to the third party lenders. Bancshares argues that these loans benefitted the Bank, and ultimately the FDIC. This argument is not persuasive. Bancshares may have pledged part of the refund proceeds, but these proceeds are the property of the Bank, and Bancshares has presented no evidence that the Bank's own board of directors pledged its own asset. Nor are we moved by the equities. Even if there had been no loans from third party lenders and had the Bank failed sooner, the Bank could still have generated the same refund had it filed separately with the IRS.

Bancshares claims that the affidavits of two certified public accountants evidences the existence of an implied agreement. We have reviewed these affidavits and find Bancshares' argument to be without merit. While there appears to have been an inconsistent practice of paying loss subsidiaries for the use of their losses, absolutely nothing in these affidavits relates to any implied agreement as to the allocation of tax refunds.

II. *Bancshares is not Entitled to Attorneys' Fees under the Fund Doctrine.*

The FDIC cross-appeals that the district court erred in awarding the Bank attorneys' fees out of the refund under the Fund Doctrine. The basic rule regarding attorneys' fees in Louisiana is that "the right of an attorney to remuneration for his professional services depends on a contract, either express or implied." *In re Interstate Trust & Banking Company,* 235 La. 825, 106 So.2d 276, 280 (1958). There exists, however, an exception under the Fund Doctrine:

> The rule is that a court of equity, or a court in the exercise of equitable jurisdiction, will, in its discretion, order an allowance of counsel fees, or, as it is sometimes said, allow costs as between solicitor and client, to a complainant (and sometimes directly to the attorney) who at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund, or common property, or who has created at his own expense, or brought into court, a fund in which others may share with him.

*Id.* (*quoting* 49 A.L.R. 1150).

Were this the kind of proceeding in which the Fund Doctrine could in principle apply, we would review the grant of attorneys' fees on an abuse of discretion standard. As we conclude, however, that this is not the kind of case in which the district court may invoke its equitable discretion under the Fund Doctrine, we view it as a matter of law which we review *de novo.*

Regarding the Fund Doctrine, we note that "[t]his theory has been applied rarely and reluctantly in Louisiana." *Baron v. Peter,* 286 So.2d 480, 484 (La.App. 1st Cir.1973). It appears that Bancshares' incurred some of the costs for which the district court awarded fees *after* the FDIC intervened. This is clearly improper because FDIC and Bancshares are "postured throughout these proceedings as [ ] adversari[es] ..." *Kelly v. Nat. Life and Acc. Ins. Co.,* 393 So.2d 130, 132 (La.App. 1st Cir.1980).

Nor does the Fund Doctrine apply to costs incurred prior to the FDIC's intervention. The legal theory in question is

the doctrine that where one litigant has borne the burden and expense of litigation that has inured to the benefit of others *as well as to himself,* those who have shared in the benefits should contribute to the expense.

*Interstate Trust,* 106 So.2d at 280 (emphasis added).

This litigation has at all times comprised only adversaries, and nothing Bancshares did benefitted the FDIC *as well as itself.* Bancshares opposed the FDIC's interests, and the FDIC's ultimate victory is due only to Bancshares' ultimate failure to win the refund for itself. This is not the kind of litigation for the common good envisioned under the Fund Doctrine.

In *Interstate Trust* attorneys representing a small number of bank depositors sued for interest they claimed should have been earned on frozen deposits after the bank had been placed in liquidation. After winning the suit, the attorneys sued for fees, claiming that they should be paid out of a common fund which had resulted from the litigation for the benefit of all depositors, not only the small number whom they had originally represented. The Louisiana Supreme Court affirmed the lower court's denial of the fees. On rehearing, however, the Louisiana Supreme Court allowed the fees under the Fund Doctrine because:

> In briefs and argument on rehearing the appellant attorneys stressed and brought forcefully to our attention for the first time the fact that although initially they instituted proceedings to recover interest in the Interstate Bank case in behalf of a small group of the depositors whose deposits had been frozen, both the trial judge and this court considered the case as one for the benefit of all depositors. The judgment of the trial court awarded all depositors interest,.... On appeal these attorneys no longer sought interest for a small group by preference and priority over all other persons, but sought affirmance of the judgment of the lower court which allowed interest, all the way back to the institution of the liquidation proceedings, *to all of the depositors.* In other words, in that appeal these attorneys championed the cause of all depositors of the bank in liquidation as a class, and although this court amended the judgment, it itself showed that it considered the case as one in behalf of all depositors by awarding interest to all depositors as stated above.

106 So.2d at 282 (emphasis in original).

In the case before us, on the other hand, Bancshares has never represented any interest but its own.

More recently, the Louisiana Supreme Court seems to have even further narrowed the boundaries of the Fund Doctrine, if indeed it retains any vitality at all. In denying the claims of attorneys who brought an action seeking to recover fees from heirs who benefitted from successful opposition of a will but who were unknown until after the judgment was final, the Supreme Court stated:

> The "fund doctrine" originated as a common law theory of equity allowing an attorney to recover fees from one not his client in very limited situations. In 1893 this court recognized this exception to the general rule that a lawyer cannot recover a fee from one who has neither employed him nor authorized another to do so. See, *McGraw v. Andrus,* 45 La.Ann. 1073, 13 So. 630 (1893). Only once since then, in *In re Interstate Trust & Banking Company, ...,* have we permitted recovery under this doctrine, and the prerequisites for such recovery were made explicit: An attorney may recover fees from those not his clients when that attorney alone and at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund, or of common property or who has created at his own expense, or brought into court, a fund in which others may share with him.

*Kirkpatrick v. Young,* 456 So.2d 622, 625 (La.1984).

Bancshares never attempted, nor did it succeed, in creating a common fund out of which others, as well as itself, could benefit. The Fund Doctrine simply does not apply to this case.

Moreover, it does not appear that Bancshares' suit created any fund at all. The FDIC maintains that the United States never denied owing the refund. Bancshares claims that the United States denied that a refund was due in the government's Response to Motion of Federal Deposit Insurance Corporation to Require the United States of America to Interplead the Funds. What the United States in fact said was:

> *As of this moment,* no refund is due by the United States to Capital Bancshares or its subsidiary, Capital Bank and Trust Company. Without admitting any liability whatsoever, it is nevertheless *likely that a refund may be made* on account of the claims filed by Capital Bancshares which led to the instant case.

[Emphasis added].

It does not appear that Bancshares' could demonstrate that its suit against the United States established any fund which the IRS would not have paid out in any case.

## CONCLUSIONS

The refund is the property of the Bank, which could have generated the refund on its own had it filed with the IRS as a separate entity. We therefore affirm the district court's summary judgment as to the ownership of the refund.

We reverse the grant of attorney's fees, however, because Bancshares never sought, either intentionally or necessarily by the very nature of its action, to benefit any party besides itself, and certainly not the FDIC. Therefore, this case is not of that very small species in which a district court may exercise it equitable discretion and award attorney's fees under the Fund Doctrine.

The Judgment of the district court is AFFIRMED in part, REVERSED in part.