In re FRANKLIN SAVINGS
CORPORATION,
Debtor.

RESOLUTION TRUST CORPORATION,
as Receiver for Franklin Savings
Association, Appellant,

v.

FRANKLIN SAVINGS CORPORATION,
Appellee.

Bankruptcy No. 91–41518–11.
Adv. No. 92–7053.
Civ.A. No. 93–2388–GTV.

United States District Court,
D. Kansas.

May 3, 1995.

R. Pete Smith, McDowell, Rice & Smith, P.C., Kansas City, MO, for debtor Franklin Sav. Corp.

Cynthia C. Dunham, Steven M. Leigh, Martin, Leigh & Laws, Erlene Krigel, Krigel & Krigel, P.C., Kansas City, MO, for appellant Resolution Trust Corp., Conservator for Franklin Sav. Ass'n.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This case comes before the court on an appeal by the Resolution Trust Corporation (RTC) from an order of the bankruptcy court denying the RTC's proof of claim for income tax refunds and ruling that the refunds are property of the bankruptcy estate by operation of 11 U.S.C. § 541. RTC contends that the debtor holds the tax refunds in trust for the RTC and that it is the actual owner of the refunds. The court has reviewed the record on appeal and is now prepared to rule. The decision of the bankruptcy court is AFFIRMED.

### I. STANDARD OF REVIEW

In reviewing decisions of the bankruptcy court, the district court must accept the factual findings of the bankruptcy court unless they are clearly erroneous. *Virginia Beach Federal Sav. & Loan Ass'n v. Wood,* 901 F.2d 849, 851 (10th Cir.1990); *Branding Iron Motel, Inc. v. Sandlian Equity, Inc. (In re Branding Iron Motel, Inc.),* 798 F.2d 396, 399 (10th Cir.1986). The district court, however, must review the bankruptcy court's legal conclusions *de novo. Wood,* 901 F.2d at 851; *Branding Iron Motel,* 798 F.2d at 399–400.

Following a two-day trial, the bankruptcy court issued 115 findings of fact and set forth the parties' stipulations and written tax agreements in full. *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),* 159 B.R. 9, 12–28 (Bankr.D.Kan. 1993). The facts are undisputed and are summarized below.

### II. FACTUAL BACKGROUND

Franklin Savings Corporation ("the holding company" or "parent") is the corporate parent and holding company of Franklin Savings Association ("the subsidiary"), its subsidiary. The holding company is the debtor in bankruptcy. The subsidiary is a stock savings and loan association chartered under the laws of the State of Kansas and has numerous subsidiaries. The holding company owns more than 92 percent of the issued and outstanding stock of the subsidiary.

Since 1985, the holding company, Franklin Financial Corporation (the holding company's predecessor in interest), the subsidiary and their other subsidiaries and affiliates have elected to file Consolidated Federal Income Tax Returns under 26 U.S.C. § 1501. The holding company and the subsidiary have entered into various tax agreements since 1985, the most recent dated June 30, 1988. The 1988 agreements are still in effect.

The tax agreements include a Tax Reimbursement Agreement and a Tax Forgiveness Agreement. Under the Tax Reimbursement Agreement, the holding company and the subsidiary agreed to file consolidated income tax returns. The subsidiary was obli-

gated to forward to the holding company the amount of tax computed as a separate tax liability under generally accepted accounting principles (GAAP) at such time as it would otherwise pay amounts owed to the Internal Revenue Service (IRS). The subsidiary's payment to the holding company was limited to the amount of the income taxes actually payable by the consolidated group plus the income tax benefit derived from any losses of the holding company included in the consolidated return. If the subsidiary's computation reflected a net operating loss or excess credits, it was required to compute the provision for recovery of current and deferred federal income taxes. It was then entitled to (a) reimbursement by the holding company to the extent of amounts previously paid to the holding company or (b) if such recovery exceeded the amounts previously paid to the holding company, then the subsidiary was entitled to credits against future amounts of income tax owed to the holding company.

Under the Tax Forgiveness Agreement the holding company would "forgive" income taxes owed by the subsidiary to it under the Tax Reimbursement Agreement. Any amounts forgiven under the agreement were treated as a contribution to the subsidiary's capital by the holding company. The liability for taxes forgiven became a liability of the holding company. Any tax benefits resulting from the subsidiary's losses or excess credits would be used to reduce any liability owed by the subsidiary to the holding company.

The subsidiary devised the tax forgiveness arrangement in order to increase its capital cushion. New regulatory capital rules which went into effect in 1985 caused officials of the subsidiary to be concerned about their ability to meet the capital requirements. Adding to their concern was the possibility that $2.9 billion in Zero Coupon Bonds issued by the subsidiary would be in default in the event that it failed to meet its capital compliance requirements. Under the default provisions of the bonds, it was required to purchase U.S. Treasury or certain Agency obligations in an amount that would, at maturity, pay off the Zero Coupon Bonds. The subsidiary would suffer millions of dollars of loss if such a default occurred.

■ Under the Tax Forgiveness Agreement, the holding company forgave the subsidiary's deferred income taxes. "Deferred income taxes" is an accounting concept which is calculated for temporary differences between the financial reporting basis and the tax basis of a company's assets and liabilities. In all likelihood, deferred income taxes will never become due. The holding company forgave approximately $110 million in taxes receivable from the subsidiary under the terms of the Tax Forgiveness Agreement. As a result, the holding company became primarily liable for the taxes and the subsidiary's capital was increased by the amount of the taxes forgiven.

On February 15, 1990, the Office of Thrift Supervision (OTS) appointed the Resolution Trust Corporation (RTC) as Conservator of the subsidiary to manage its assets. The RTC subsequently became the Receiver of the subsidiary on July 16, 1992.

The holding company, on behalf of the subsidiary, challenged the legality of the regulatory action naming RTC the Conservator and filed suit in the United States District Court for the District of Kansas. See Franklin Sav. Ass'n v. Office of Thrift Supervision, 742 F.Supp. 1089 (D.Kan.1990). The parties refer to this as the "OTS Litigation." The district court found in favor of the plaintiffs after a lengthy trial in which the court admitted evidence outside the OTS administrative record. The Tenth Circuit Court of Appeals reversed the decision on the ground that the district court should have limited its review to the administrative record and should not have heard evidence outside that record. Franklin Sav. Ass'n v. Office of Thrift Supervision, 934 F.2d 1127 (10th Cir.1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). Some of the evidence admitted in the OTS Litigation referred to the tax agreements at issue in this case. The holding company urged the bankruptcy court to accept the district court's findings in the OTS Litigation, but the bankruptcy court made its own independent findings of fact based on the evidence presented in this adversary proceeding.

The holding company received tax refunds from the IRS in February 1989 and April

1990 which were reimbursed to the subsidiary. Subsequently, the holding company has received three tax refund checks from the IRS during RTC's conservatorship of the subsidiary. The holding company received a refund in April 1991 in the amount of $1,952,-145 resulting from its Consolidated Federal Tax Return for the fiscal year end June 30, 1990. It received a refund in May 1991 in the amount of $8,274,939.35 resulting from a series of amendments to the 1988 Consolidated Federal Tax Return. It received the final refund in May 1992 in the amount of $858,-737.37 resulting from the Consolidated Federal Tax Return for the fiscal year end June 30, 1991. The subsidiary provided the funds to make the tax payments that resulted in the refunds. The refunds were the result of either overpayments by the subsidiary or were generated by net operating losses of it or its subsidiaries.

The holding company placed the tax refunds in interest-bearing government securities and notified the RTC of the refunds. The RTC, on behalf of the subsidiary, claimed ownership of the tax refunds totalling approximately $11 million.[1] The holding company responded by filing a suit in the United States District Court for the District of Kansas on May 14, 1991. It sought a declaratory judgment that it was entitled to the refunds. On July 26, 1991, the holding company filed for Chapter 11 relief in the bankruptcy court. RTC filed a proof of claim and an amended proof of claim which alleged that the holding company was liable to it for the tax refunds. The holding company's objection to the claim created the adversary proceeding before the bankruptcy court.

Following a two-day trial, the bankruptcy court held that the holding company is the owner of the tax refunds and that the refunds are property of the bankruptcy estate under 11 U.S.C. § 541. The bankruptcy court also found that the evidence did not support the imposition of a state law constructive trust whether based on a corporate doctrine of fairness or for unconscionable

conduct by a fiduciary. RTC now appeals the bankruptcy court's decision.

### III. DISCUSSION

RTC makes several arguments that it is the owner of the tax refunds. RTC asserts that the tax agreements are silent as to "ownership" and that the court should apply the general rule that the subsidiary which generates the refund owns the refund. RTC also argues that the tax agreements are ambiguous and that the intent of the parties should control. In the alternative, RTC urges the court to find that the tax agreements are invalid and unenforceable. Additionally, RTC argues that the holding company's actions in entering the tax agreements and forgiving deferred taxes were a breach of its fiduciary duty to the subsidiary and were unconscionable conduct by a fiduciary. Consequently, RTC argues that the court should impose a state law constructive trust and award the tax refunds to RTC. Finally, RTC seeks reversal on the basis of the bankruptcy court's abuse of discretion in admitting expert testimony expressing an opinion on an ultimate issue of law.

The holding company urges the court to affirm the bankruptcy court's decision. The court will address each of RTC's bases for reversal below.

### A. The Tax Agreements

The Internal Revenue Code does not address whether a tax refund should inure to the benefit of the parent company or the subsidiary which sustained the loss that created the refund. *Capital Bancshares, Inc. v. FDIC,* 957 F.2d 203, 206 (5th Cir. 1992) (citations omitted). As a general rule, a parent corporation holds tax refunds in trust for its subsidiaries. *Id.* at 208; *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp.),* 473 F.2d 262, 265 (9th Cir.), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); *Jump v. Manchester Life & Casualty Management Corp.,* 438 F.Supp. 185, 189 (E.D.Mo.1977), *aff'd,* 579 F.2d 449 (8th Cir.

---

1. Unless otherwise indicated, any further reference to the RTC includes the subsidiary, Franklin Savings Association.

1978); *FDIC v. Brandt (In re Florida Park Banks, Inc.),* 110 B.R. 986, 989 (Bankr. M.D.Fla.1990); *United States v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 111 B.R. 631, 637–38 (Bankr.N.D.Ohio 1990). The above courts indicate, however, that the parties may vary the general rule by agreement. *Capital Bancshares,* 957 F.2d at 207 (court will not question allocation of tax refund which results from express or implied agreement between the affiliated companies); *Western Dealer Management,* 473 F.2d at 264 ("Normally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability."); *Brandt,* 110 B.R. at 988 (parties are free to allocate by agreement the tax refunds resulting from the filing of consolidated return); *Revco,* 111 B.R. at 637 (where the parties made no agreement concerning the ultimate disposition of the tax refund, parent corporation acted as agent for the consolidated group).

■ In the case at bar, the holding company and the subsidiary entered into a Tax Reimbursement Agreement and a Tax Forgiveness Agreement. RTC argues that the tax agreements do not address the issue of ownership of income tax refunds.

The Tax Reimbursement Agreement states in pertinent part:

3. Benefit from Losses or Excess Credits of Franklin [the subsidiary]. If the computation in paragraph 1 above reflects a net operating loss or excess credits, then, at the time prescribed in paragraph 1, Franklin shall compute the provision for recovery of Federal income taxes (current and deferred), if any, and shall be entitled to (a) reimbursement by Parent [the holding company], at the time prescribed in paragraph 2, to the extent of amounts previously paid to parent or (b) if such recovery exceeds amounts previously paid to Parent, Franklin shall be entitled to credits against future amounts to be paid by Franklin to Parent pursuant to paragraph 2.

In paragraph 1 of the agreement, the subsidiary is required to compute its tax and that of its subsidiaries as if they were not members of the consolidated group. Under paragraph 2, the subsidiary is required to pay the amounts computed under paragraph 1 to the holding company at such time as it would otherwise pay the amounts owed to the IRS.

The bankruptcy court held that the language of the Tax Reimbursement Agreement evidenced the parties' intent to create an obligation in the nature of a receivable. *In re Franklin Sav. Corp.,* 159 B.R. 9, 29 (Bankr.D.Kan.1993). The agreement provides that the subsidiary is entitled to "reimbursement" by the holding company or "credits" against future amounts to be paid by the subsidiary to the holding company. The bankruptcy court concluded that the subsidiary holds only an unsecured claim to the funds, not ownership of the refunds. *Id.*

The court agrees that the bankruptcy court's holding is correct. The agreement speaks specifically to the allocation of any tax refunds received by the holding company. Under the terms of the agreement, the taxes were not held in trust for the benefit of the subsidiary to be automatically turned over to it. Certain amounts would be "reimbursed" under certain conditions.

RTC argues that the tax agreements are ambiguous or, in the alternative, that the agreements are invalid and unenforceable. The court is unconvinced that the tax agreements are ambiguous. The agreement addresses the circumstances under which the subsidiary is entitled to reimbursement of tax refunds from the holding company. Lack of the term "ownership" does not create ambiguity.

RTC argues that the agreements are invalid and unenforceable because the setoff provision lacks mutuality. RTC asserts that the holding company could conceivably offset monies owed by the subsidiary against tax refunds created by losses of its subsidiaries. The Tax Forgiveness Agreement provides that tax benefits generated by the subsidiary "shall reduce any liability owed" by it to the holding company. The court is unconvinced that the terms of the setoff provision lack mutuality. The provision speaks of "losses and/or excess credits" of the subsidiary, not

its subsidiaries. Additionally, RTC does not point to any evidence presented in the trial below that the agreements lacked mutuality. The court concludes that under the tax agreements, the tax refunds are property of the bankruptcy estate under 11 U.S.C. § 541.

### B. Breach of Fiduciary Duties and Unconscionable Conduct

■ RTC argues that even if the tax refunds are property of the bankruptcy estate pursuant to the terms of the tax agreements, the court should impose a constructive trust and award the refunds to it. RTC argues that the holding company's actions regarding the tax agreements and refunds were a breach of its fiduciary duty to the subsidiary and that its conduct was unconscionable.

Whether the holding company's conduct was a breach of fiduciary duties or unconscionable are issues of fact. The bankruptcy court held that "there is no basis in fact for imposing a constructive trust on the tax refunds and the Court finds that [the subsidiary] has no equitable rights in the tax refunds." *In re Franklin Sav. Corp.*, 159 B.R. at 33. The bankruptcy court found that there was not a breach of fiduciary duty or unconscionable conduct on the part of the holding company.

The court cannot disturb the bankruptcy court's factual findings unless they are clearly erroneous. The factual findings were not clearly erroneous. The evidence presented at trial established that the tax agreements were designed to increase the subsidiary's capital cushion through the holding company's forgiveness of the subsidiary's tax liability. This was a benefit to the subsidiary and its shareholders. The agreements were submitted to regulators and to the subsidiary's independent auditors for approval and review. RTC fails to point to any evidence in the record that would convince the court that the bankruptcy court's findings were clearly erroneous. The court will not, therefore, reverse on these grounds.

### C. Expert Testimony

■ Finally, RTC argues that the bankruptcy court abused its discretion in considering expert testimony expressing an opinion on an ultimate issue of law. An expert witness can testify in the form of an opinion even if it embraces an ultimate issue to be decided by the trier of fact. Fed. R.Evid. 704(a). An expert may not testify as to a legal conclusion drawn from applying the law to the facts of the case. *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir.1993); *A.E. ex rel. Evans v. Independent School District No. 25*, 936 F.2d 472, 476 (10th Cir.1991). "An expert may, however, refer to the law in expressing his or her opinion." *Independent School District*, 936 F.2d at 476. A court's admission of expert testimony is reviewed for abuse of discretion. *Id.* An error is harmless unless it affects substantial rights and results in actual prejudice. *Id.*

■ RTC asserts that Ernest M. Fleischer, Chairman of the Board of the holding company and the subsidiary, was allowed to offer legal conclusions during his testimony which encroached on the court's decision making process. RTC objects to Mr. Fleischer's testimony, arguing that he was allowed to construe the tax agreements and render opinions regarding the reduction of any liability owed by the subsidiary to the holding company by any tax refunds, whether the holding company had any offset rights, and whether the tax agreements required the payment of any refund to the subsidiary. RTC does not point to any specific testimony by Mr. Fleischer that it believes was improper. The court's review of Mr. Fleischer's testimony does not reveal any abuse of discretion by the bankruptcy court.

Expert testimony stating a legal conclusion can usurp the function of the jury in deciding the facts and can interfere with the function of the judge in instructing the jury on the law. *Simpson*, 7 F.3d at 188. The dangers of allowing this type of testimony in a jury trial are not the same in a trial to the court. The judge is able to independently make findings of facts and conclusions of law and is not unduly influenced by the testimony. Mr. Fleischer's testimony was primarily factual. The opinions offered by Mr. Fleischer did not result in actual prejudice.

The court concludes that the bankruptcy court did not abuse its discretion in allowing

the testimony of Mr. Fleischer regarding the tax agreements.

IT IS, THEREFORE, BY THE COURT ORDERED that the order of the bankruptcy court denying appellant's proof of claim and ruling that the tax refunds are property of the bankruptcy estate is **AFFIRMED.**

**IT IS SO ORDERED.**