Robert L. PRATTER, Acting Insurance Commissioner of the Commonwealth of Pennsylvania, in his official capacity as Rehabilitator of Penn Treaty Network America Insurance Company, Plaintiff

v.

PENN TREATY AMERICAN CORPORATION,
Defendant.

Commonwealth Court of Pennsylvania.

Decided Oct. 22, 2010.
Publication Ordered Nov. 5, 2010.

James G. Colins and Virginia Lynn Hogben, Philadelphia, for plaintiff.

Benjamin M. Schmidt, Philadelphia, for defendant.

OPINION BY Judge BROBSON.

This is an original jurisdiction action brought by the statutory rehabilitator for Penn Treaty Network America Insurance Company (In Rehabilitation) (Penn Treaty) on behalf of the company.[1] The named Defendant is Penn Treaty American Corporation (PTAC), Penn Treaty's parent company and sole shareholder.

Presently before the Court for disposition are PTAC's preliminary objections to Penn Treaty's Complaint. Upon considering the parties' briefs and after hearing oral argument on the preliminary objections, the Court will overrule PTAC's preliminary objections with the exception of its preliminary objection to Count V for lack of specificity, which the Court will sustain.

---

1. By Order dated January 6, 2009 (Docket No. 5 M.D. 2009) (Rehabilitation Order), this Court, at the request of the Pennsylvania Insurance Commissioner and with the consent of Penn Treaty's Board of Directors, placed Penn Treaty into rehabilitation under Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, added by the Act of December 14, 1977, P.L. 280, *as amended*, 40 P.S. §§ 221.1–.63 (Article V).

## BACKGROUND

### A. Complaint Allegations

#### 1. The Tax Refund Claim

PTAC is the corporate parent and sole shareholder of Penn Treaty. For tax years 2003 through 2008, PTAC and its subsidiaries (including Penn Treaty) filed consolidated federal income tax returns. During this time, Penn Treaty paid the amount of federal income tax owed under the consolidated tax returns attributable to Penn Treaty's operations and those of Penn Treaty's subsidiaries. For tax years 2005 through 2007, Penn Treaty paid the entirety of the consolidated group's federal income tax liability to the Internal Revenue Service ("I.R.S.").

On several occasions, PTAC filed for and received federal income tax refunds based on a carryback of subsequent tax year losses. Those refunds included refunds of taxes that Penn Treaty paid in prior tax years as offset by Penn Treaty's losses in subsequent years. In each case, PTAC paid over to Penn Treaty the refunds attributable to Penn Treaty's business. As a result, Penn Treaty paid, net of refunds that PTAC received from the I.R.S. and paid over to Penn Treaty, *$1,505,813* for the consolidated group's federal tax liability for tax years 2005 through 2007.

In 2008, Penn Treaty had a federal income tax net operating loss of approximately $16 million. The federal income tax net operating loss of Penn Treaty and its subsidiaries combined that year totaled approximately $13.7 million.

In 2009, a change in the federal corporate income tax laws allowed the carryback of 2008 and 2009 net operating losses for up to five years. PTAC thus applied to the I.R.S. for a refund of $1,677,661 in tax payments for the tax years 2003 through 2007 based on a carryback of *Penn Treaty's* 2008 net operating loss. Of the total

refund amount sought, *$1,505,813* related to the taxes Penn Treaty paid (net of prior refunds) for the consolidated group for tax years 2005 through 2007. PTAC has received the full amount of the refund that it sought from the I.R.S.

Penn Treaty claims that it is entitled to $1,505,813 of the total refund (Tax Refund Claim). The first four counts of the Complaint relate to the Tax Refund Claim and assert breach of contract (Count I), unjust enrichment (Count II), conversion (Count III), and breach of fiduciary duty (County IV) claims.

#### 2. PTO Claim

In early 2004, PTAC and Penn Treaty officers determined that Penn Treaty's surplus would fall below the level required under Florida law in order for Penn Treaty to continue writing insurance in Florida. To improve Penn Treaty's balance sheet position, PTAC agreed to assume Penn Treaty's liability for accrued paid time off (PTO liabilities) as of December 31, 2003, and to reimburse Penn Treaty for any actual amounts on that liability that Penn Treaty had already paid out to its employees.

PTAC and Penn Treaty reached similar agreements in 2004 and 2005. As a result, PTAC agreed to assume and reimburse Penn Treaty for a total of $699,894 in PTO liabilities. Penn Treaty modified its financial statements to reflect PTAC's assumption of this liability. As a result, Penn Treaty was able to write business in Florida that it would not otherwise have been able to write.

Penn Treaty has paid out $521,396 in PTO liabilities, which PTAC agreed to assume and for which PTAC agreed to reimburse Penn Treaty. Despite requests by the statutory rehabilitator for Penn Treaty (Rehabilitator), PTAC has refused to reim-

burse Penn Treaty. Penn Treaty claims that PTAC must reimburse Penn Treaty for the $521,396 in assumed and paid out PTO liabilities (PTO Claim). The last two counts of the Complaint relate to the PTO Claim and assert breach of contract (Count V) and estoppel (Count VI) claims.

### B. Preliminary Objections

PTAC has filed preliminary objections, objecting to all but one count of the Complaint—Count I (breach of contract for Tax Refund Claim). PTAC argues that this Court should strike Counts II and VI from the Complaint because the Rehabilitator lacks the statutory authority to assert causes of action for unjust enrichment and estoppel. PTAC argues that the Court should dismiss Counts III (conversion) and IV (breach of fiduciary duty) under the "gist of the action" doctrine. PTAC also argues that the Court should dismiss Counts III, IV, and VI (estoppel) for failure to state a claim upon which relief can be granted (demurrer). Finally, PTAC argues that the Court should strike Count V (breach of contract for PTO Claim) for lack of specificity.

### ANALYSIS

### A. Lack of Capacity to Sue (Counts II & VI)

█ PTAC seeks dismissal of Counts II and VI of the Complaint because the Re-

habilitator lacks the capacity to assert claims of unjust enrichment and promissory estoppel. Both PTAC and Penn Treaty direct this Court to Section 516(c) of Article V[2] as the source of the Rehabilitator's authority to bring this action. Section 516(c) provides:

> If it appears to the rehabilitator that there has been criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employe, or other person, he may pursue all appropriate legal remedies.

PTAC argues that Section 516(c) of Article V limits the types of lawsuits the Rehabilitator is authorized to bring on behalf of an insurer in receivership. Based on the "plain language" chosen by the General Assembly, PTAC argues that this Court must conclude that the Rehabilitator lacks authority to pursue claims of unjust enrichment and promissory estoppel, because such causes of action are not expressly identified in Section 516(c) of Article V.

To bolster its argument, PTAC also directs us to compare Section 516(c) with the statutory authority to sue given to a bankruptcy trustee under Section 323(b) of the United States Bankruptcy Code (11 U.S.C. § 323(b))[3] and to a statutory liquidator[4] under Section 523(12) and (13) of Article V

2. 40 P.S. § 221.16(c).

3. The Bankruptcy Code provides: "The trustee in a case under this title has capacity to sue and be sued." 11 U.S.C. § 323(b).

4. Under Article V, the purposes of a rehabilitation and liquidation are apparent from the terms themselves. Rehabilitation is a process of receivership, the goal of which is to correct the conditions that led to the court to order the insurer into receivership. *See* 40 P.S. § 221.16. The insurer in rehabilitation does not cease operations; rather, control is placed temporarily in the hands of the Penn-

sylvania Insurance Commissioner, as statutory rehabilitator. The goal, of course, is for the rehabilitation to end someday and for a stronger insurer to emerge. By contrast, a liquidation means the cessation of the business of the insurer, the winding up of its affairs, and, ultimately, the insurer's dissolution. The primary responsibility of the statutory liquidator is to marshal the assets of the insurer in liquidation and to pay, to the extent possible, the obligations of the insurer pursuant to a plan of distribution. *See id.* §§ 221.23, .36.

(40 P.S. § 221.23(12), (13)) [5]. PTAC argues that the language authorizing the trustee and liquidator to bring suit in these provisions is more general and thus broader than the language that the General Assembly used in Section 516(c) when conferring the Rehabilitator with the power to bring legal action. By choosing not to use similarly broad language in Section 516(c) of Article V, the General Assembly intended to provide the rehabilitator with a more limited authority to sue.

In response, Penn Treaty offers a different take on the "plain language" in Section 516(c) of Article V. It claims that the first clause of this section is merely prefatory language and was not intended to limit the broad authority to sue granted by the General Assembly in the final words of this section—"he may pursue all appropriate legal remedies." Penn Treaty also relies on this Court's decision in *Foster v. Peat Marwick Main & Co.*, 138 Pa.Cmwlth. 147, 587 A.2d 382 (1991), *aff'd sub nom. Foster v. Mutual Fire, Marine and Inland Insurance Co.*, 544 Pa. 387, 676 A.2d 652 (1996), wherein this Court examined Section 516(c) to determine whether the section authorizes a rehabilitator to bring claims not on behalf of the insurer in rehabilitation, but on behalf of its policyholders, creditors, and others. Penn Treaty argues that our ruling in *Peat Marwick* supports a liberal interpretation of Section 516(c), which should compel this Court to conclude that the Rehabilitator is authorized to pursue claims for unjust enrichment and

promissory estoppel on Penn Treaty's behalf.

To resolve this preliminary objection, the Court must ascribe meaning to Section 516(c) of Article V and discern the extent of a rehabilitator's authority to sue. In doing so, the Court is guided by long-established principles of statutory construction:

> The objective of interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Generally, the best indication of legislative intent is the plain language of the statute. Thus, it is well settled that when the words of a statute are clear and unambiguous, they are "not to be disregarded under the pretext of pursuing its spirit." Furthermore, the "[w]ords and phrases [of a statute] shall be construed according to rules of grammar and according to their common and approved usage[.]" It is only when the words of the statute are not explicit that the court should seek to determine the General Assembly's intent through consideration of statutory construction factors. Finally, when ascertaining the intent of the General Assembly, we are mindful of the general command that we presume that it "does not intend a result that is absurd, impossible of execution or unreasonable."

*Koken v. Reliance Ins. Co.*, 586 Pa. 269, 287–88, 893 A.2d 70, 80–81 (2006) (*Reliance*) (citations omitted) (quoting 1 Pa. C.S. §§ 1903(a), 1921(b)).

---

**5.** The cited statutory provision provides:

The liquidator shall have the power:

. . . .

(12) To continue to prosecute and to institute in the name of the insurer or in his own name any and all suits and other legal proceedings, in this Commonwealth or elsewhere, and to abandon the prosecution of claims he deems unprofitable to pursue further. If the insurer is dissolved under section 522, he shall have the power to apply to any court in this State or elsewhere for leave to substitute himself for the insurer as plaintiff.

(13) To prosecute any action which may exist in behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person.

40 P.S. § 221.23 (footnote omitted).

■ Applying these standards, the Court rejects PTAC's claim that the prefatory language in Section 516(c) is intended to limit the Rehabilitator's authority to pursue only causes of action for "breach of contract," "breach of fiduciary duty," or torts. Indeed, it would follow from PTAC's argument that a rehabilitator is authorized to bring a private criminal action in the courts of this Commonwealth, as "criminal" conduct is also within the list of actionable conduct in Section 516(c). The Court simply refuses to read Section 516(c) as authorizing a statutory rehabilitator for an insurance company to share prosecutorial functions with county district attorneys [6] and the Pennsylvania Attorney General.[7] *See Commonwealth v. Malloy*, 304 Pa.Super. 297, 450 A.2d 689 (1982) (discussing roles of crime victim and district attorney in criminal prosecution).

Instead, Section 516(c) authorizes the Rehabilitator to take action in the face of what it believes to be *conduct* harmful to the insurer. The Court agrees with Penn Treaty that the statutory language at issue is merely prefatory to a general authority of a rehabilitator to bring a civil lawsuit for redress of what "appears" to the rehabilitator to be conduct detrimental to the insurer. Such an interpretation gives meaning to the General Assembly's inclusion of "criminal" conduct in the section, because while a private citizen lacks the authority to prosecute a crime, the *conduct*, nonetheless, may also support a civil claim for damages. *Malloy*, 450 A.2d at 691. PTAC's reading conflates the word "conduct" in the statute with "cause of action."

The Rehabilitator has alleged facts in the Complaint that, if accepted as true, evidence actionable *conduct* detrimental to Penn Treaty that falls within the express terms of Section 516(c). The Tax Refund Claim and PTO Claim have their origins in alleged agreements between Penn Treaty and PTAC. On Penn Treaty's behalf, the Rehabilitator has initiated this lawsuit because he believes that PTAC is failing to honor its agreements. That the Rehabilitator has included breach of contract causes of action in the Complaint (Counts I and V) evidences the Rehabilitator's belief that PTAC has engaged in actionable conduct of the type set forth in Section 516(c).

■ Under these circumstances, Section 516(c) of Article V authorized the Rehabilitator to "pursue all *appropriate* legal remedies" against PTAC. (Emphasis added.) In the face of what appears to the Rehabilitator to be conduct in breach of a contract, this language authorizes the Rehabilitator to not only pursue a strict breach of contract claim, but also alternative claims that sound in contract. "Unjust enrichment," though equitable in nature, is described as a doctrine creating a "contract implied-in-law, or quasi contract." *Dep't of Health v. Data–Quest, Inc.*, 972 A.2d 74, 77 n. 5 (Pa.Cmwlth.2009). Similarly, for statute of limitations purposes, our Supreme Court has lumped claims of promissory estoppel in with contract claims and unjust enrichment claims, reasoning:

> As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy *to a contract dispute.* Thus, as promissory estoppel makes otherwise unenforceable agreements binding, *the doctrine sounds in contract law and we hold that, like other contract actions,* the statute of limitations for a cause of action in promissory estoppel is governed by [42 Pa.C.S. § 5525].

6. *See* Section 1402 of the Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. § 1402.

7. *See* Section 205 of the Act of October 15, 1980, P.L. 950, 71 P.S. § 732–205.

*Crouse v. Cyclops Indus.*, 560 Pa. 394, 403, 745 A.2d 606, 610 (2000) (emphasis added). The clear and unambiguous language in Section 516(c), therefore, authorizes the Rehabilitator to pursue its unjust enrichment (Count II) and promissory estoppel (Count VI) claims on behalf of Penn Treaty against PTAC.

The Court would reach the same conclusion if it were to conclude that Section 516(c) of Article V is ambiguous. Where a statutory provision is ambiguous, the Court may appropriately look to such things as the "occasion and necessity for the statute" and the "object to be attained." 1 Pa.C.S. § 1921(c)(1), (4). In addition, the Court must presume that the General Assembly "intends the entire statute to be effective and certain," *id.* § 1922(2), and that statutes or parts of statutes *in pari materia* should be construed together, *id.* § 1923.

In *Peat Marwick,* the statutory rehabilitator for Mutual Fire, Marine & Inland Insurance Company (Mutual Fire) filed a complaint against Mutual Fire's auditors on behalf of Mutual Fire's insureds, policyholders, and creditors. The auditors filed preliminary objections, arguing, *inter alia,* that Section 516(c) only authorized the rehabilitator to file lawsuits on behalf of the insurer—Mutual Fire. The auditor thus sought dismissal of the claims the rehabilitator brought on behalf of insureds, policyholders, and creditors.

Although Section 516(c) only expressly refers to the rehabilitator's authority to pursue legal remedies "on behalf of the insurer," the Court rejected the auditor's restrictive reading of Section 516(c):

> [T]o assume that Section 516(c) precludes the Rehabilitator from bringing actions on behalf of policyholders and other creditors is to ignore the mandate of Section 501 of Article V, requiring us to liberally construe the Article to effec-

tuate its purpose, plainly stated therein, which is "[to protect] the interests of *insureds, creditors* and *the public* generally." The Rehabilitator is thereby authorized to take action—including legal action—to insure the protection of policyholders, among others. Section 516(c), read in the context of the entire article and construed *in pari materia* with Section 501, does not limit the Rehabilitator to claims asserted by Mutual Fire's corporate body, as Peat Marwick would have us hold.

*Peat Marwick,* 587 A.2d at 385 (citation omitted).

This same reasoning supports the conclusion here. The practical implications of adopting PTAC's more restrictive reading of Section 516(c) cannot be ignored. Under PTAC's view, an insurer's legitimate promissory estoppel and unjust enrichment claims could whither on the vine during a rehabilitation and fall prey to the statute of limitations. *See* Section 517 of Article V, 40 P.S. § 221.17 (providing that statute of limitations for claims by insurer are tolled only for period of time between filing of petition for rehabilitation and order either granting said petition or denying it). If this happens, and the Rehabilitator is unsuccessful on the strict breach of contract claim, the insurer would have no legal redress. There could be no recovery for the alleged wrong, which is neither in the insurer's best interest or the best interests of policyholders and creditors.

■ Our interpretation that a rehabilitator may pursue any and all appropriate legal remedies for alleged wrongful conduct on behalf of the insurer avoids such an absurd and unreasonable conclusion. *See* 1 Pa.C.S. § 1922(1). Moreover, as in *Peat Marwick,* our interpretation is entirely consistent with the purposes underlying Article V, "with minimum interference with the normal prerogatives of the own-

ers and managers of insurers." Section 501 of Article V, 40 P.S. § 221.1(c). It would be incongruous for this Court to conclude now that a rehabilitator is precluded from pursuing causes of action not expressly identified in Section 516(c), when this Court has previously concluded in *Peat Marwick* that the rehabilitator may pursue claims under Section 516(c) on behalf of persons not expressly identified.

Finally, our interpretation is consistent with the comments of those who originally drafted the blueprint for Section 516(c). In *Reliance,* our Supreme Court noted that Article V follows from a model act of the National Association of Insurance Commissioners (NAIC), which, in turn, was based on a 1967 Wisconsin law. Based on this history, the Supreme Court looked to the Wisconsin legislature's comments as an aid in interpreting a provision in Article V, reasoning: "What is more helpful is a consideration of the Wisconsin legislature's comment in adopting what is, in essence, the blueprint for the Pennsylvania statute." *Reliance,* 586 Pa. at 292–93, 893 A.2d at 84.

Section 516(c) of Article V is modeled after Section 645.33(4) of the Wisconsin law, which provides:

> **(4) Pursuit of insurer's claims against insiders.** If the rehabilitator finds that there has been criminal or tortious conduct or breach of any contractual or fiduciary obligation detrimental to the insurer by any person, the rehabilitator may pursue all appropriate legal remedies on behalf of the insurer.

Wis. Stat. § 645.33(4). Like Section 516(b) of Article V (40 P.S. § 221.16(b)), the Wisconsin law also provides general powers to the rehabilitator to "take the action he or she deems necessary or expedient to reform and revitalize the insurer."

*Id.* § 645.33(2). In light of this general and broad power, the Wisconsin legislature's comment to paragraph (4) of Section 645.33(4) is enlightening:

> **Comment on sub. (4):** *The rehabilitator could do what this provision directs even if it were omitted. However, it seems important to urge him not to be reluctant to pursue such persons as strenuously as he can.*

Comment to Wis. Stat. § 645.33(4). In light of this comment, it appears that the original drafters intended this provision to be merely hortatory. To interpret and apply Section 645.33(4)'s progeny, then, as restricting a rehabilitator's authority to act would be contrary with how other states, particularly the originating state, have interpreted and construed this provision. *See* 1 Pa.C.S. § 1927 (addressing construction of uniform laws).

For all of these reasons, PTAC's preliminary objections challenging the authority of the Rehabilitator to pursue claims of unjust enrichment (Count II) and promissory estoppel (Count VI) on behalf of Penn Treaty will be overruled.

### B. Gist of the Action (Counts III & IV)

PTAC urges us to dismiss Counts III and IV of the Complaint, in which PTAC alleges tort causes of action in pursuit of its Tax Refund Claim. PTAC points to Count I of the Complaint, in which Penn Treaty also seeks to recover for the Tax Refund Claim under a breach of contract theory. In Count I, Penn Treaty alleges that there is a written agreement between the parties—"Penn Treaty American Corporation Affiliated Tax Sharing Agreement" (Tax Sharing Agreement) [8]—and that PTAC's refusal to remit the federal tax refund at issue is a violation of the Tax

---

8. The Tax Sharing Agreement is attached to     the Complaint as Exhibit "C".

Sharing Agreement. (Compl.¶ 44.) Relying on the "gist of the action doctrine," PTAC argues that in light of Count I and the ·Tax Sharing Agreement, Penn Treaty should not also be permitted to pursue tort remedies for the Tax Refund Claim.

■■ Generally, the "gist of the action" doctrine "precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 718 (Pa.Super.2005). The doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002). Whereas actions in tort "lie from a breach of duties imposed as a matter of social policy," actions in contract "lie for the breach of duties imposed by mutual consensus." *Id.* "In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodies by the law of torts." *Id.*

■ In determining whether an action sounds in contract or in tort, this Court applies the "misfeasance/nonfeasance" test: [9]

Under this test, we determine if there exists a cause of action in tort growing out of a breach of contract based on "whether there was an improper performance of a contractual obligation (misfeasance) rather than the mere failure to perform (nonfeasance)."

... If there is "misfeasance," there is an improper performance of the contract in the course of which the defendant breaches a duty imposed by law as a matter of social policy. In such instances, the "gist" of the plaintiff's action sounds in tort and the contract itself is collateral to the cause of action. On the other hand, if there is "nonfeasance," the wrong attributed to the defendant is solely a breach of the defendant's duty to perform under the terms of the contract. In such instances, the "gist" of the plaintiff's action sounds in contract, *and the plaintiff would not have a cause of action but for the contract.*

*Yocca*, 806 A.2d at 944 (emphasis added) (citation omitted) (quoting *Grode v. Mutual Fire, Marine and Inland Ins. Co.*, 154 Pa.Cmwlth. 366, 623 A.2d 933, 935 (1993)).

■ Applying this test, the Court cannot conclude at this early stage of the proceeding—*i.e.,* (a) before PTAC has responded to Penn Treaty's breach of contract allegations, and (b) before the question of whether the Tax Sharing Agreement includes a provision allocating tax refunds is properly before the Court for disposition—that this case is definitively one of PTAC's nonfeasance under the Tax Sharing Agreement. Likewise, the Court cannot conclude that Penn Treaty would be unable to pursue its Tax Refund Claim in the absence of the Tax Sharing Agreement.[10] Accordingly, the Court declines at this time to dis-

9. Though our approach differs somewhat from the Pennsylvania Superior Court's four-part analysis, which the court explained in *Reardon v. Allegheny College*, 926 A.2d 477 (Pa.Super.2007), *appeal denied*, 596 Pa. 755, 947 A.2d 738 (2008), both approaches "tend to achieve the same results." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 806 A.2d 936, 944 (Pa.Cmwlth.2002), *rev'd on other grounds*, 578 Pa. 479, 854 A.2d 425 (2004).

10. The overwhelming view of courts that have addressed the issue of entitlement to federal tax refunds in a parent/subsidiary context is that under certain circumstances the subsidiary may be entitled to all or a portion of the refund even in the absence of a tax sharing agreement. *See, e.g., Capital Bancshares, Inc. v. Federal Deposit Ins. Corp.*, 957 F.2d 203 (5th Cir.1992); *In re Bob Richards Chrysler–Plymouth Corp., Inc.*, 473 F.2d 262 (9th Cir.

miss Counts III and IV of the Complaint under the "gist of the action" doctrine. PTAC, however, may ask this Court to revisit the "gist of the action" doctrine as applied to Penn Treaty's tort claims at a later stage of this proceeding.

### C. Demurrer (Counts III, IV, & V)

■ In addressing PTAC's preliminary objections in the nature of a demurrer, the Court must assess "whether on the facts alleged in the complaint the law states with certainty that no recovery is possible, accepting as true all well-pled allegations of material fact and inferences reasonably deducible therefrom and resolving any doubts in favor of overruling the demurrer." *Selfspot, Inc. v. Butler County Family YMCA*, 818 A.2d 587, 592 (Pa.Cmwlth.), *appeal denied,* 574 Pa. 756, 830 A.2d 977 (2003). The Court need not accept conclusions of law, unwarranted inferences, arguments, or opinions. *Wagaman v. Attorney Gen. of the Cmwlth.*, 872 A.2d 244, 246 (Pa.Cmwlth.2005). "Preliminary objections will be sustained only in cases clear and free from doubt that the facts pleaded are legally insufficient to establish a right to relief." *McSpadden v. Dep't of Corr.*, 870 A.2d 975, 979 (Pa.Cmwlth.2005).

#### 1. Conversion

■ To maintain a cause of action for conversion against PTAC, Penn Treaty was required to plead that PTAC deprived Penn Treaty of the use or possession of its property without Penn Treaty's consent and without lawful justification. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n. 3 (Pa.Super.2000).[11] PTAC claims that Penn Treaty fails to allege sufficient fact in support of its conversion claim. Specifically, PTAC argues that Penn Treaty does not have any ownership interest in the tax refund in question and thus is not being deprived of its property. In making this argument, PTAC relies on provisions of the Tax Sharing Agreement, arguing that it was wholly appropriate for Penn Treaty to receive the federal tax refunds: "There is no dispute that PTAC rightfully possessed legal title to the tax refund when PTAC collected it from the I.R.S." (PTAC Mem. at 8.)

Penn Treaty's conversion claim is based on PTAC's refusal to pay over to Penn Treaty the portion of the tax refund attributable to Penn Treaty's business, (Compl.¶¶ 20–22.) not on any alleged wrongdoing by PTAC in collecting the refund from the I.R.S. Penn Treaty alleges that the portion of the tax refund withheld by PTAC is Penn Treaty's property.[12] (Compl.¶ 53.) Penn Treaty alleges that PTAC is withholding the funds without Penn Treaty's consent and without legal justification. (Compl.¶¶ 55–56.) Penn

1973), *cert. denied sub nom. W. Dealer Mgmt., Inc. v. England,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); *In re First Central Fin. Corp.,* 269 B.R. 481 (Bankr. E.D.N.Y.2001), *aff'd,* 377 F.3d 209 (2004); *In re Nelco, Ltd.,* 264 B.R. 790 (Bankr.E.D.Va. 1999); *In re Franklin Sav. Corp.,* 159 B.R. 9 (Bankr.D.Kan.1993), *aff'd,* 182 B.R. 859 (D.Kan.1995); *Matter of Florida Park Banks, Inc.,* 110 B.R. 986 (Bankr.M.D.Fla.1990); *In re Revco D.S., Inc.,* 111 B.R. 631 (Bankr. N.D.Ohio 1990).

11. While "[m]oney may be the subject of conversion[,] … the failure to pay a debt is not conversion." *Pittsburgh Constr. Co. v. Griffith,* 834 A.2d 572, 581 (Pa.Super.2003) (citation omitted), *appeal denied,* 578 Pa. 701, 852 A.2d 313 (2004). As noted above in the discussion regarding PTAC's "gist of the action" preliminary objection, the Court is not yet convinced that Penn Treaty's Tax Refund Claim is a failure to pay a debt, such that Penn Treaty's remedy must lie in breach of contract and not in tort.

12. *See supra* n. 10.

Treaty thus has pled sufficient facts to state a cause of action for conversion.

Ultimately, ownership of the disputed portion of the tax refund may very well be a mixed question of fact and law. In terms of pleaded facts, the Court is satisfied that Penn Treaty has pled the requisite facts to support a conversion cause of action on the Tax Refund Claim. The parties, however, have not yet fully briefed the legal issue of ownership of or entitlement to the disputed portion of the tax refund. Thus, the Court cannot yet say with certainty that Penn Treaty cannot prevail as a matter of law on its conversion claim. For these reasons, PTAC's demurrer to the conversion claim will be overruled.

### 2. Breach of Fiduciary Duty

▮ PTAC seeks dismissal of Penn Treaty's breach of fiduciary duty claim (Count IV), arguing that Penn Treaty has not pled and cannot establish a fiduciary duty owed by PTAC to Penn Treaty, its wholly-owned subsidiary. Specifically, PTAC argues that Pennsylvania law does not recognize a fiduciary duty owed by a parent corporation to its wholly-owned subsidiary. In response, Penn Treaty argues that PTAC owed a fiduciary duty to act fairly because (a) PTAC, as the sole shareholder, dominated or controlled Penn Treaty; and (b) Pennsylvania insurance law imposes on PTAC a duty to enter into transactions that are "fair and reasonable" to Penn Treaty.

Generally speaking, under Pennsylvania law a fiduciary duty will arise in two contexts: (1) in a principal/agent relationship, where the agent is expected to act with the utmost duty of loyalty to the interests of the principal; and (2) where the facts evidence a confidential, or special relationship, such that "one has the power to take advantage of or exercise undue influence over the other." *eToll, Inc.*, 811 A.2d at 21–23. Disposition of this demurrer requires that the Court not simply examine the arguments of the parties. The Court must also be guided by the averments in the Complaint.

It appears to the Court that both PTAC, in advancing its demurrer, and Penn Treaty, in responding to the demurrer, have mischaracterized the "fiduciary duty" that Penn Treaty holds up as the foundation of its breach of fiduciary duty claim. In addition to setting forth the general factual background for its Tax Refund Claim in paragraphs 7 through 34 of the Complaint, Penn Treaty couches its breach of fiduciary duty claim in the following terms:

58. PTAC, in filing for a refund of taxes paid by [Penn Treaty] based on [Penn Treaty's] 2008 losses, acted as [Penn Treaty's] agent and obtained that refund as [Penn Treaty's] agent.

59. The $1,505,813 of the tax refund that is a refund of taxes paid by [Penn Treaty] and the interest paid by the [I.R.S.] thereon are property of [Penn Treaty] held in trust for [Penn Treaty].

60. PTAC's failure to pay over to [Penn Treaty] the $1,505,813 of the tax refund that is a refund of taxes paid by [Penn Treaty] and the interest paid by the [I.R.S.] thereon is a breach of PTAC's fiduciary duty to [Penn Treaty] as trustee.

(Compl. ¶¶ 58–60.)

While Penn Treaty avers that PTAC filed for a refund of taxes and received that refund from the I.R.S. as Penn Treaty's "agent" (Compl. ¶ 58), Penn Treaty does not claim that PTAC failed to carry out its alleged duties in this regard.[13] Ac-

---

13. Case law interpreting the role/responsibili-   ties of a parent corporation filing consolidat-

cordingly, Penn Treaty's Complaint does not purport to set forth a breach of fiduciary duty claim based on a principal/agent relationship.

■ Instead, Penn Treaty alleges that PTAC holds the portion of the tax refund at issue in this case *"in trust* for [Penn Treaty]." (Compl. ¶ 59 (emphasis added).) Penn Treaty alleges that PTAC's failure or refusal to remit those funds to Penn Treaty "is a breach of PTAC's fiduciary duty to [Penn Treaty] *as trustee."* (*Id.* ¶ 60 (emphasis added).) Thus, while the parties in their respective filings with the Court on PTAC's preliminary objections focus on the question of whether a parent owes a fiduciary duty to its wholly-owned subsidiary either at common law or by statute, that relationship is not the omphalos of Penn Treat's breach of fiduciary duty claim. Rather, Penn Treaty's breach of fiduciary duty claim is based on an allege trustee/beneficiary relationship—a special, or confidential relationship.[14] "A trustee owes a fiduciary duty to the beneficiary. He violates that duty when he has a personal interest in trust dealings that might affect his judgment." *Sutliff v. Sutliff,* 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987) (citations omitted).

The Court will thus overrule PTAC's preliminary objection in the nature of a demurrer, as the demurrer is based on a mischaracterization of Penn Treaty's fiduciary duty claim as one based on PTAC's and Penn Treaty's parent/subsidiary relationship. Penn Treaty's fiduciary duty claim is premised on an alleged trustee/beneficiary relationship between PTAC and Penn Treaty arising out of PTAC's filing for and receiving a tax refund for the benefit of Penn Treaty, not on the parent/subsidiary relationship.

### 3. Promissory Estoppel

■ To maintain a claim for promissory estoppel (Count V), Penn Treaty will be required to prove the following: "(1) the promisor made a promise that would reasonably be expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Peluso v. Kistner,* 970 A.2d 530, 534 (Pa. Cmwlth.2009). PTAC argues that Penn Treaty has failed to plead requisite facts to support the second element of the cause of action—detrimental reliance. Upon review of Penn Treaty's pleading, the Court disagrees.

Penn Treaty alleges that in early 2004, it determined that its surplus had fallen to such a level that it could no longer write insurance business in the State of Florida.[15] (Compl.¶ 23.) Penn Treaty alleges that to enable Penn Treaty to continue to

---

ed tax returns on behalf of its subsidiaries as the subsidiaries' "agent" appears to limit that role to only the filing of the consolidated returns and the receipt of refunds as a matter of convenience for the I.R.S. "[T]his agency is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S." *In re First Central Fin. Corp.,* 269 B.R. at 489 (citing *Jump v. Manchester Life & Cas. Mgmt. Corp.,* 579 F.2d 449 (8th Cir.1978)).

14. The Court does not here decide the questions of whether Penn Treaty has adequately

pled facts to establish such a relationship or whether such a relationship can even exist as a matter of law, as neither of those questions are raised in PTAC's preliminary objections.

15. Though Penn Treaty does not direct the Court to any particular statute, Florida, like most states, requires insurers to maintain certain minimum surplus levels to do business within the state. *See* Fla. Stat. §§ 624.401 (surplus as to policyholders), .4084 (risk-based capital), .4095 (restrictions on written premium).

write business in Florida, PTAC, on three occasions, agreed (i.e., promised) to relieve Penn Treaty of certain balance sheet liabilities—the PTO liabilities—in order to improve Penn Treaty's surplus levels. (Compl.¶¶ 24–26.) Penn Treaty alleges that in reliance on these promises, it altered its accounts payable ledgers and removed the PTO liabilities from its balance sheet, "which increased its surplus to levels sufficient to permit it to continue to issue insurance policies in the state of Florida." [16] (Compl.¶¶ 27, 66, 67.)

Insurance is a highly-regulated industry, with a particular emphasis on monitoring the ongoing financial condition of insurers to protect existing and prospective policyholders. States, like Florida, have enacted statutory schemes that require insurers to file periodic financial reports and to maintain minimum capital and surplus to continue to write business. Penn Treaty alleges that PTAC's agreement/promise to assume the PTO liabilities enabled Penn Treaty to write business in Florida that, under this statutory scheme, it would not have been able to write without violating Florida law. Based on these allegations, Penn Treaty has pled sufficient facts to show its detrimental reliance on PTAC's agreement/promise to assume certain balance sheet liabilities.[17]

### D. Lack of Specificity (Count V)

■ PTAC complains that Penn Treaty's breach of contract count with respect to the PTO claim lacks the level of specificity required under the Pennsylvania Rules of Civil Procedure. The Court agrees.

In its Complaint, Penn Treaty alleges three oral agreements [18] by which PTAC agreed to assume the liabilities in question. (Compl.¶¶ 24–26.) With respect to the first agreement, Penn Treaty avers only the substance of the agreement and the reasons for it. (Compl.¶ 24.) It does not aver at all when the agreement was reached or the people involved in striking the oral deal. With respect to the second alleged agreement, Penn Treaty avers that the parties reached the agreement "[l]ater in 2004," but again does not identify the people involved in striking the oral agreement. (Compl.¶ 25.) Similarly, with the third agreement, Penn Treaty alleges that the parties reached the agreement "[i]n 2005," but again does not identify the persons involved.

■ The Court believes that Penn Treaty's averments fall short of the standards set forth in Rule 1019 of the Pennsylvania Rules of Civil Procedure. Where a plaintiff seeks to recover on an oral agreement, it is particularly important that the pleading at least identify in as specific detail as possible the date of the agreement and the individuals involved. This information will enable a corporate defendant faced with a claim based on an alleged oral agreement to investigate the

---

16. See Fla. Stat. § 624.424 (requiring insurers to file "full and true" financial statements on quarterly and annual basis).

17. In support of its demurrer to the promissory estoppel claim, PTAC directs us to paragraph 68 of the Complaint, wherein Penn Treaty alleges that as a result of the alleged agreement/promise, Penn Treaty wrote over 700 additional policies in Florida with "projected" liabilities of $2.9 million. PTAC argues that the allegations in this paragraph are too speculative to support a promissory estop-

pel claim. Because the Court has concluded, however, that other allegations in the Complaint support Penn Treaty's claim of detrimental reliance, the Court will not address PTAC's challenge directed to this single paragraph of the Complaint.

18. Penn Treaty does not aver that the agreements were in writing. We, therefore, will assume that the alleged agreements were oral and not written. See Rambo v. Greene, 906 A.2d 1232, 1235 n. 4 (Pa.Super.2006).

claim and, in particular, speak with those who have allegedly entered into the oral agreement at issue. Based on this investigation, the corporate defendant will be better positioned to respond to the allegations and assert defenses to the claim. This is a pleading requirement that cannot be avoided by merely asserting that the defendant already knows the material facts that have been omitted from the pleading.

Accordingly, the Court will sustain PTAC's preliminary objection to Count V of the Complaint and direct Penn Treaty to file an amended and more specific pleading with respect to its breach of contract cause of action on the PTO Claim.

An appropriate Order follows.

President Judge LEADBETTER did not participate in the decision in this case.

### ORDER

AND NOW, this 22nd day of October, 2010, upon consideration of Defendant Penn Treaty American Corporation's preliminary objections to the Complaint in this matter, it is hereby ORDERED that Defendant's preliminary objection to Count V (breach of contract) for lack of specificity is SUSTAINED. Penn Treaty is directed to file and serve an amended and more specific pleading with respect to Count V within twenty (20) days of the date of this Order. Failure to do so will result in dismissal of this Count of the Complaint *with prejudice*.

The remaining preliminary objections are OVERRULED.